**UNITED STATES of America**

**v.**

**Ellen CAMPBELL, Defendant.**

**No. ST–CR–90–45.**

United States District Court,
W.D. North Carolina,
Statesville Division.

Oct. 23, 1991.

Thomas J. Ashcraft, U.S. Atty., Charlotte, N.C., for U.S.

Larry D. Tucker, James F. Wyatt, III, Charlotte, N.C., for defendant.

## OPINION

MULLEN, District Judge.

Ellen Campbell was tried and convicted of the charges contained in a three count bill of indictment. At the conclusion of the trial, she moved for a judgment of acquittal on all three charges and her motion was denied as to the charge of causing a false HUD–1 Statement to be filed with a government agency (18 U.S.C. § 1001) as alleged in Count III. The court reserved ruling on the motion as it related to the remaining charges of money laundering [18 U.S.C. § 1956(a)(1)(B)(i) ] as found in Count I, and engaging in a transaction in criminally derived property [18 U.S.C. § 1957(a) ] as charged in Count II. The court has since received briefs and heard arguments from both the defendant and the government regarding the motion and will grant the motion.

### I. Evidence at Trial

Viewed in the light most favorable to the government, the evidence at trial revealed the following facts:

In the summer of 1989 Ellen Campbell [1] was a licensed real estate salesperson

---

1. Ellen Campbell is also referred to in the testimony as Ellen Campbell Fremin, her married name.

working at Lake Norman Realty in Mooresville, North Carolina. During the same period, Mark Lawing was a drug dealer in Kannapolis, North Carolina, who was both on the way up and on the way down—his profits had steadily risen to $10,000 or more per week and he was soon to be indicted. Because he had recently purchased a Four Winds motorboat, Lawing decided to buy a house on Lake Norman.[2] At the time Lawing was maintaining his boat on Lake Norman and living in Kannapolis. He apparently conducted all of his meetings with Ellen Campbell and Lake Norman Realty by commuting from Kannapolis to Mooresville.

Lawing first made contact with Campbell by stopping at Lake Norman Realty's Mooresville office and picking out her business card because her photograph was the most attractive of those displayed. Lawing, presenting himself as the owner of L & N Autocraft, called Campbell and scheduled an appointment with her and began looking for houses priced for under $100,000. Dissatisfied with those houses, Lawing maintained contact with Campbell and began to look at houses priced in excess of $150,000. During one trip, while house shopping, Lawing brought a briefcase containing $20,000 in cash, showing the money to Campbell to demonstrate his ability to purchase a house.

Lawing continued to make appointments with Campbell, seeing her about once a week and calling her three to four times each week. Lawing stated that the entire transaction period took about five weeks and he looked at ten to twelve houses. All of his trips to look at houses were made during normal business hours, and Lawing was usually accompanied by Randy Sweatt, a fellow dope dealer. Lawing and Sweatt would travel to Lake Norman in either a gold Porsche owned by Sweatt or a red Porsche owned by Lawing.[3] During their trips Lawing would bring his cellular phone, and both of the drug dealers would consume food and beer while looking at houses. Lawing stated that he often wore gold jewelry and Campbell characterized both of the men as "beach boys."

Lawing eventually settled upon a house listed for $191,000 and owned by Edward and Nancy Guy Fortier. The listing with the Fortiers had been secured by Sara Fox, another real estate saleswoman with Lake Norman Realty. After negotiations, Lawing and the Fortiers agreed on a price of $182,500 and entered into a written contract. Lawing was unable to secure a loan, and decided to ask the Fortiers to accept $60,000 under the table in cash and to lower the contract price to $122,500. Lawing contacted Ellen Campbell and informed her of his proposal. Campbell relayed the proposal to Sara Fox, and Fox passed along the offer to the Fortiers. Fox had the Fortiers execute a new listing agreement which increased the commission percentage and lowered the sales price. Fox stated that Campbell told her James Jennings, the broker-in-charge, had handled a cash transaction that way before. Fox never spoke to James Jennings or Eugene McIntyre (the company sales manager) about the change, but acted upon information given to her by Campbell.

Thereafter Lawing met the Fortiers, Fox and Campbell at the Mooresville sales office with $60,000 in cash. The money was wrapped in small bundles and carried in a brown paper grocery bag. The money was counted, divided between the Fortiers and a new contract executed reflecting a sales price of $122,500. Lawing tipped both Fox and Campbell with a couple of hundred

---

2. "Lake Norman" is used locally and in this order to refer to both the large lake, whose waters are used as a source of coolant for the local nuclear power plant, and the wealthy community surrounding the lake. Lake Norman is a prime recreation area for many Carolinians located due north of Charlotte, approximately thirty miles east of Kannapolis and adjacent to and south of Mooresville. Waterfront property

there has experienced significant appreciation and is generally expensive.

3. There was apparently one exception when Lawing met Campbell at the house he eventually purchased by taking his boat. Lawing stated that Campbell saw him pull up to the house in his boat on that occasion.

dollars and left.[4] The Fortiers and the saleswomen then began to talk about the money. The Fortiers had earlier asked if it was counterfeit and were told by Lawing that it was not. After Lawing left, Nancy Fortier again said "Is this for real?" Fortier then heard Campbell say she "didn't care where the money came from."

The parties were aware that Lawing wanted the cash transaction muted, because he was lying to his parents about the sales price. Unbeknownst to Campbell or Fox, Lawing had also given his parents $31,000 cash to apply to the purchase of the house. He told his parents that the $31,000 was Las Vegas winnings. In fact, he had been to Las Vegas a few months before the closing, but Lawing could not recall if he talked to Ellen Campbell about his Las Vegas trip. In describing the trip on direct examination Lawing stated that he had not made any money; that he had won some money but he spent it. On cross-examination he stated that he won $45,000 in Las Vegas and that he also gambled on NASCAR races in North Carolina. On re-direct examination, however, Lawing stated that he had $34,000 in net losses from his trip to Las Vegas.

Disregarding the Las Vegas trip, Sara Fox testified that before the cash transaction was made Ellen Campbell mentioned that it "may have been drug money." (Tr. pp. 190–91)

James Jennings recalled having a conversation with Ellen Campbell in which the "general issue" concerned having a contract and protecting the commission if a trade or $60,000 was going to be involved. When asked if Ellen Campbell told him $60,000 was being paid outside the terms of the contract Jennings said he "[could] not say that [he] remembered that."

The first contract had been placed in the office of William Austin, the closing attorney. After the cash transaction was completed and the second contract executed, Ellen Campbell went to his office to exchange the second contract for the first. Austin did not see the first contract, however. Austin's office then prepared closing documents, including a HUD–1 and 1099–S, which reflected a sales price of $122,500. Ellen Campbell was present at the closing, along with Sara Fox, William Austin, the Fortiers, Lawing and Lawing's parents. The closing documents, including the HUD–1 and the 1099–S were signed, all reflecting a sale price of $122,500. No one mentioned the $60,000 in cash. Ellen Campbell eventually received over $3500 as a result of the sale—$3400 as a commission and a "couple of hundred" as a tip from Lawing.

After presentation of the evidence, the jury convicted Ellen Campbell on all three counts of the indictment.

## II. Judgment of Acquittal

### A. Review of the Evidence

■ The test for reviewing the sufficiency of the evidence to support a conviction was set forth in the Supreme Court case In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). In Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) the court expounded upon the Winship requirements for review of the evidence that supports a conviction. When considering a motion for a judgment of acquittal a court is not required to ask itself whether it believes the evidence establishes guilt beyond a reasonable doubt. Rather, the court is required to determine if any rational trier of fact could have found the essential elements beyond a reasonable doubt when the evidence is viewed in the light most favorable to the government. Jackson 443 U.S. at 318–19, 99 S.Ct. at 2788–89. While this is a broad standard, it does require more than a mere modicum of evidence supporting conviction; the prosecution is required to prove its case beyond a reasonable doubt. Thus, a guilty verdict entitles the government to have all of the evidence viewed in a light most favorable to it, and to have the benefit of all reasonable inferences that may be drawn from that evidence, but due process requires more than a scintilla of evidence to have been offered to establish proof

4. Fox later testified that her tip was only $50.

beyond a reasonable doubt. *Jackson* at 319–320, 99 S.Ct. at 2789–90.

### B. Essential Elements— Money Laundering

An individual may not be convicted of money laundering unless the government proves beyond a reasonable doubt each of the following:

1. That the individual conducted a financial transaction in interstate commerce,
2. with knowledge that the property involved in the transaction represented the proceeds of some form of unlawful activity,
3. with the transaction in fact involving the proceeds of specified unlawful activity; and
4. with the purpose, in whole or in part, of concealing or disguising "the nature, the location, the source, the ownership, or the control" of the illegally acquired proceeds.

From the facts of this case it is readily apparent that a rational jury could reasonably conclude that the sale of the property was in interstate commerce and that the transaction involved proceeds from the sale of cocaine as specified in the indictment. More problematic, however, are the jury findings (a) that Ellen Campbell knew that the transaction was designed, in part, to conceal the nature of the drug money [5] and (b) that Ellen Campbell knew the purchase price represented the proceeds of some form of unlawful activity.

A review of the case law which touches upon the money laundering statutes has failed to disclose a case which fully comports with the issue before the court. The reported cases reveal that the money laundering statutes have been applied in a great variety of situations, as Congress apparently intended. No reported case has been found, however, which resulted in the prosecution of the agent for a seller involved in a single sale followed by failure to accurately report the sale to a governmental agency as required by law.

### C. Concealed Transactions—Sanders

█ The only case which closely approximates the factual situation now before the court is found in *United States v. Sanders,* 929 F.2d 1466 (10th Cir.1991). In *Sanders,* the defendant was convicted of two counts of money laundering based upon two separate automobile purchases. The defendant made two car purchases approximately six months apart, part of the prices of which were paid for with the proceeds of her husband's drug activities. The first car was purchased with a loan, $3535 in cash (the drug proceeds) and a trade-in. The defendant personally handled the transaction with her husband and they both conspicuously used the vehicle after its purchase. The second car was purchased with $11,400 in cash (the drug proceeds) and a trade-in. In making the second purchase the defendant and her husband appeared at the dealership to negotiate the sale, made the purchase and placed title to the car in the name of the husband's daughter (the defendant's step-daughter). The defendant signed her step-daughter's name as purchaser of the car, and thereafter, the daughter appeared at the dealership.

The Tenth Circuit found that these facts were not sufficient to justify a guilty verdict on the money laundering count for either car purchase. The court specifically found that because both the defendant and her husband had appeared at both purchases and were readily identifiable by the sales staff, there was no intention to conceal the "source of the proceeds." As to the second purchase in particular, the court stated that because the daughter appeared shortly after the purchase and actually used the family name, she was so readily identified with the defendant and the defendant's husband that their use of their daughter's name could not be viewed as an attempt at concealment.

---

5. The location, source, ownership and control of the money were readily apparent in the person of Mark Lawing.

In reaching its decision to nullify the money laundering conviction the *Sanders* court held:

"by the express terms of the statute, a design to conceal or disguise the source or nature of the proceeds is a necessary element for a money laundering conviction. In other words, the purpose of the money laundering statute is to reach commercial transactions intended (at least in part) to disguise the *relationship* of the item purchased with the person providing the proceeds and that the proceeds used to make the purchase were obtained from illegal activities." [emphasis added] 929 F.2d at 1472.

The *Sanders* court also footnoted the quoted passage to note the aptness of this interpretation in light of the legislative history accompanying Senate Bill No. 2683, an act which contained the same language as the money laundering statute enacted into law. Senate Report No. 99-433, which accompanied Senate Bill 2683 noted:

"This language is intended to include transactions designed to conceal the identity of the participants to the transaction, where it also can be proved that the funds involved in the transaction are in fact the proceeds of the crime" quoted in Sanders at p. 1472.

While the *Sanders* case is not perfectly congruent with the case before this court, some relevant comparisons must be noted. As in *Sanders*, there was no concealment of the identity of the buyer in this case. Mark Lawing appeared at every consequential meeting which led to the sale of the property. He personally brought the sixty thousand dollars which represented the proceeds of his drug activity to the real estate office where it was counted in his presence. It is true that, similar to the *Sanders* defendant, he placed title in the real estate with a relation of the first degree. But the *Sanders* court found that such an act cannot be viewed as an attempted concealment where every other action of the purchaser serves to identify the relationship between the true buyer, the property and the cash.

As both a factual and legal matter, *any* rational finder of fact *would have* to conclude that Mark Lawing was as closely identifiable with his parents and the purchase of the Lake Norman property as the *Sanders* defendant was identifiable with her stepdaughter and the purchase of the automobiles. However, unlike the defendant in *Sanders*, the defendant here is not the purchaser, but the salesperson who partially oversaw the transaction. Thus, not only is there no evidence of concealment under the rationale of the *Sanders* case, but here the prosecution is aimed at a defendant whose involvement in the undisguised transaction is even more attenuated.

Given that, viewed in the light most favorable to the government, this case represents less than the proof offered in the *Sanders* case and is directed against a defendant much more removed from involvement in the transaction than the *Sanders* defendant, the court must set aside the jury verdict and enter a judgment of acquittal. The court wishes to make it clear, though, that even if the *Sanders* case were not available as guidance, and viewing the statute more broadly than the *Sanders* court, acquittal would still be necessary.

### D. Concealment, Knowledge and Willful Blindness

The government claims the element of concealment is satisfied by the omission of the full sales price from the closing documents, whether Mark Lawing's relationship with the transaction was undisguised or not. [p. 21 and footnote 23 govt. bf.] In addition, the government has presented this case under a "willful blindness" theory, arguing that Ellen Campbell intentionally averted her attention away from facts which would have made it obvious to her that Mark Lawing was a "known" drug dealer. Thus, the government contends, Ellen Campbell "knew" she was conducting a transaction with a drug dealer, was willing to conceal part of that transaction from legitimate authorities, and from this it can be concluded that she knew that the purpose of the transaction was the concealment of drug proceeds.

Although this construction of concealment is somewhat broader than the construction applied by the *Sanders* court, it appears to be supported by the legislative history. While the *Sanders* court said the transaction had to be designed to "conceal the identities of the parties to the transaction," the legislative history suggests that a transaction which conceals the illegal derivation of the currency would also be prohibited. For example, Representative McCollum indicated that an undisguised transaction could fall under the statute's coverage when he asserted that a corner grocer could be convicted for openly selling produce to a dealer if he knew:

"[that a drug dealer] had no other source of income ... or had some more direct knowledge ... [that the dealer] was just standing outside on that street corner before he came in ... like if [the grocer] saw him doing it,"

However, Representative Lungren's follow-up to Representative McCollum's statement suggest the limits of this type of prosecution as well. Representative Lungren stated:

"I think it repetitive of what he [Representative McCollum] said, but I think it is extremely important. It is *not* 'should have known, might have known, a reasonable person would have known,' it *is* 'this person knew the source of the income.' " [emphasis added] [p. 10–11 D's bf.]

While Representative Lungren's comments go to the knowledge element rather than the concealment element of the offense, his statement makes it clear that there must be a plan or design, on the part of the person being prosecuted, to conceal either the identity of the drug dealer or the source of his money, and that the statute is not merely limited to concealment of the dealer-purchaser's identity.

■ Therefore, in a prosecution against a party other than the drug dealer, the elements requiring (1) a purpose of concealment, and (2) knowledge of the drug dealer's activities, necessarily become intermingled. This is so because in order for a party other than the drug dealer to have an intent to conceal the illegal source of the dealer's money, the party must first know the dealer's occupation. While all of this may seem self-evident, it is the distinction between this case and the *Sanders* case which allows the government to contend *Sanders* is inapplicable.

■ In attempting to offer proof that Ellen Campbell knew of Lawing's drug related activities and designed the Lake Norman sale to disguise those activities, however, the government falls far short of positing sufficient evidence on which a conviction could be based. All of the testimony that Ellen Campbell "knew" [or but for willful blindness would have known] that Mark Lawing was involved in drug trafficking regarded, not testimony about Lawing's drug activities, but evidence regarding his appearance and his lifestyle. The government contends the source of Lawing's money was "obvious" because he "drove a red Porsche ... owned an expensive new motor boat ... carried a portable cellular phone ... flashed $20,000 in cash ... [and] drank beer away from his place of business during the business day." [govt bf p. 16]. The government also points out that Lawing had a friend who drove a gold Porsche, but a flashy car driven by an associate hardly seems relevant given the litany of conspicuous consumption revealed about Lawing himself. None of this evidence which the government highlights proves that Mark Lawing was anything but a spendthrift playboy who enjoyed demonstrating his wealth, however it might have been acquired. While Lawing admitted he was a drug dealer on the witness stand, he testified that he never made such a confession to Ellen Campbell [Tr. 75–76]. Absent such a confession Ellen Campbell had only Mark Lawing's "looks" to go by.

Even though the image projected by Mark Lawing might draw attention to itself and arouse suspicion when viewed in the abstract, it has to be noted that it would not be unusual for someone seeking a house on Lake Norman to drive a European sports car, own a new boat or use a cellular phone. Lake Norman has been heavily de-

veloped and promoted as a vacation/waterfront luxury area. It would be unsurprising if Ellen Campbell met and dealt with individuals with a taste for expensive consumer goods as a routine part of her business. Thus, while Mark Lawing's lifestyle was not common, his habits were not so unusual that he could be "known" as a drug dealer from his outward appearance alone; more than just image must be shown.

The only evidence which could even remotely be viewed as sufficient to support the government's contentions that Ellen Campbell knew the source of the proceeds and attempted to conceal them, was evidence that Lawing was a "known drug dealer in Kannapolis." Assuming Lawing was indeed a known drug dealer in the community, the legislative history previously discussed indicates that such evidence would have been sufficient to obtain a conviction for money laundering against a merchant who dealt with him, if the merchant knew Lawing had no other source of income or knew the cash being used was the direct result of a drug deal. The actual circumstances of this case contrasted with that hypothetical scenario demonstrate the degree to which the proffered evidence is insufficient.

In this case the evidence showing that Lawing was a known drug dealer came from a fellow drug dealer. Not a single member of the Kannapolis community testified regarding Lawing's reputation. Assuming for the moment, though, that a reputation in the drug culture is sufficient to establish a community reputation, additional facts must be noted. Kannapolis is a medium sized urban to suburban city located in a different county than the small suburban residential areas of Lake Norman and Mooresville. It lies approximately thirty miles away from Lake Norman. Thus, in order to continue to be sufficient to support a conviction, the testimony about Lawing's reputation as a "known" drug dealer would have to be expansive enough to include a "community" well in excess of one million people living in dozens of cities spread over three counties and encompassing something on the order of one thousand square miles. But even if the evidence were sufficient to have established all of this, more must be assumed.

Assuming the evidence is sufficient to show Lawing's reputation as a drug dealer was known in some definable "community" of which Ellen Campbell was a part, the legislative history and the language of the statute also require the government to show that she had direct knowledge that the cash involved in the sale was cash produced from drug activity or that she knew Lawing had no other source of income. To paraphrase the earlier quote from Representative Lungren, the government may not show only that Ellen Campbell "could've, should've or would've" known, the government must show Ellen Campbell *knew* she was dealing with illegal proceeds. Rather than providing evidence which proves this knowledge, though, the government's evidence at trial undercuts such a contention.

The undisputed evidence from the government was that Mark Lawing held himself out as the operator of a car repair shop and owner of a restaurant which was to be opened. [Tr. at 26, 47, 56] Ellen Campbell knew of these purported businesses. [In addition, Campbell presented disputed evidence which the court will assume the jury disbelieved, that Lawing won a large sum of money in a trip to Las Vegas (compare Tr. 48 and 363–64)]. Thus, the government's own evidence showed that Lawing gave the appearance of owning or participating in two cash intensive businesses. The only other evidence offered during the course of the trial which might establish that Ellen Campbell "knew" the source of the proceeds was the statement of Sara Fox.

Sara Fox testified that, prior to the sale of the Lake Norman property, Ellen Campbell said that it "may have been drug money," but Fox could not recall when this statement was made. [Tr. p. 190–91][6] In

6. Specifically, Fox's testimony was as follows:

Q: What conversation did you [Fox] have with her [Campbell] about the cash, if any?

addition, on cross examination, Fox acknowledged that she testified before the grand jury that she could not remember if Campbell had ever said anything about drug money and stated then "I can't honestly say that I heard her say that" [TR. p. 195]. Yet Sara Fox is the only witness able to offer relevant testimony that Ellen Campbell knew she "may have" been conducting a transaction involving drug money. Without more this is not enough for any rational finder of fact to have concluded that Ellen Campbell was guilty beyond a reasonable doubt.

Even before the contradictory grand jury testimony of Sara Fox is taken into account, Fox's trial testimony provides (at most) insufficient evidence to establish the knowledge element of the crime beyond a reasonable doubt. When the grand jury testimony is taken into account and given the minimum of the credibility it deserves (because if fully believed it destroys her trial credibility), the showing by the government is even further diminished. Although the evidence regarding Lawing's lifestyle is not wholly irrelevant, combined with Sara Fox's hearsay testimony, it is not enough to adequately buttress the government's case.

### E. Judgment of Acquittal— Money Laundering

■ Following the *Sanders* analysis, the government has failed to offer sufficient evidence tending to show that Ellen Campbell engaged in the Lake Norman transaction with the purpose, in part, of concealing the source of the drug money. Under this court's independent analysis, and as a second ground for acquittal, this court finds that the government also failed to establish sufficient evidence from which any rational jury could possibly find that she engaged in the transaction with the knowledge that Mark Lawing was paying for the property with proceeds of his drug activity. Under this court's analysis, because she did not know that a portion of the purchase price represented the proceeds of drug activity, it would also be impossible to find that Ellen Campbell participated in the sale with the purpose of hiding the nature of the drug proceeds. Therefore, this court will grant Ellen Campbell's motion for a judgment of acquittal on Count I charging a money laundering violation under 18 U.S.C. § 1956(a)(1)(B)(i).

### III. Judgment of Acquittal Transactions in Criminally Derived Property

#### A. Essential Elements

■ Ellen Campbell's conviction under Count II of the indictment for engaging in a transaction in criminally derived property in violation of 18 U.S.C. § 1957(a) must also be vacated and a judgement of acquittal entered as to that count. In order to be convicted of engaging in a transaction in criminally derived property, the government must prove that a defendant (1) knowingly engaged or attempted to engage

A: She had mentioned before or I recall that she said this may be—that it would be cash.
Q: Yes.
A: And this was before the, you know, once we had the contract going.
Q: Did she say where she thought the cash was coming from?
A: She mentioned that it may have been drug money.
Q: Do you remember where she told you that?
A: I don't recall. It would have been in the office. But I don't know when or where.
On cross examination Fox additionally testified:
Q: Let me ask you this: You said that Ellen Campbell mentioned to you that this money might have been drug money to this jury here today under oath, didn't you?
A: Yes.

Q: I'm going to ask you to look at Page 18 of your Grand Jury transcript and ask you if you answered this question this way:
Question: She never hinted to you that he might have been in drugs or even given some hint?
Answer: I can't recall that she actually said anything.
Question: Well, did she ever come to a conclusion about where the money might be coming from?
Answer: It's so hard to say if I honestly heard this. You know, after a hearing all the advertising afterward, it's like did she ever say anything to me actually, is this dirty money or laundered money or drug money. I can't honestly say that I heard her say that.
Do you recall making that statement before the Grand Jury?
A: Yes, I do.

in a monetary transaction involving criminally derived property, (2) with such property valued at more than $10,000, and (3) with such money actually being derived from specified criminal activity. The second and third elements of this offense have been proven by the government. However, the government failed to offer sufficient evidence from which a rational jury could conclude that the defendant knowingly engaged in a transaction involving criminally derived property.

### B. Knowledge

█ As the discussion for the money laundering count indicates, no rational jury could have found from the evidence offered at trial that Ellen Campbell knew Mark Lawing was paying for real estate with drug proceeds. For those reasons, the court concludes that *any* rational jury could only have found that Ellen Campbell was unknowingly engaged in a transaction in criminally derived property. The court will therefore enter a judgment of acquittal as to Count II. As previously noted, the court has already denied the motion for a judgment of acquittal on Count III.

### IV. New Trial

As a final matter, under Fed.R.Crim.P. 29(d), the court is required to address the question of whether the defendant's motion for a new trial under Fed.R.Crim.P. 33 should be conditionally granted. The court will conditionally grant the defendant's motion for a new trial, should the entry of a judgment of acquittal be reversed on appeal.

### A. Standard for Consideration of Motion

█ * * * As noted by the United States Court of Appeals, Fourth Circuit:

Rule 33 allows a district court to grant a new trial in the interest of justice when the motion attacks the weight of the evidence, the court's authority is much broader than when it is deciding a motion to acquit on the ground of insufficient evidence. In deciding a motion for a new trial, the district court is not constrained by the requirement that it view the evidence in the light most favorable to the government. Thus, it may evaluate the credibility of thw witnesses. When the evidence weighs so heavily against the verdict that it would be unjust to enter judgment, the court should grant a new trial.

*United States v. Arrington,* 757 F.2d 1484, 1485 (4th Cir.1985).

Nevertheless, the court is not merely sitting as a "thirteenth juror," to determine whether it would have acquitted or convicted the defendant. The "interests of justice" only require a new trial where the evidence at trial preponderates heavily against the verdict. *United States v. Felice,* 481 F.Supp. 79 (N.D. Ohio 1978); *United States v. Simms,* 508 F.Supp. 1188 (W.D.La.1980). A verdict must be set aside where the manifest weight of the evidence goes against proof of an essential element, however. *United States v. Parks,* 460 F.2d 736 (5th Cir.1972). Thus, the court is cast in the role not only of determining if the verdict is contrary to law, but also must decide if the verdict is contrary to the clear weight of the evidence. In adopting this broader standard for review of the evidence for a new trial, the court must make some initial observations.

### B. Assessment of the Witnesses

First, the quality of the government's witnesses would be tested by any objective review of the trial. The evidence previously summarized shows that on the key issue of the case, Sara Fox's trial testimony did not corroborate her earlier grand jury testimony nor was it supported by any other evidence at all. When directly questioned about her grand jury statement that her memory was tainted by "all the advertising afterward," Fox denied that "the advertising" referred to the subsequent money laundering investigation. This denial appears to fly in the face of any rational meaning ascribed to her statement.

Similarly troubling aspects appeared in the testimony of other witnesses. Although the defendant has attacked the testimony of Mark Lawing as an interested

witness and convicted felon, his testimony was largely believable and consistent.[7] The testimony of James Jennings (adduced to refute the defendant's contention that she relied on her broker's advice), however, appeared less than forthright. It was clear from both his personal appearance at the witness stand and the precision with which Jennings attempted to phrase the ideas he wished to convey that he was extremely uncomfortable testifying. Inasmuch as Mr. Jennings is a salesman by profession with significant experience in "selling" to people he does not know, his considerable discomfort and uneasiness seems to result not from the prospect of speaking to the jury, but rather as a result of the content of his testimony. However, jury error in the assessment of these particulars of the trial testimony alone, would not warrant a new trial.

### C. Predominance of Mark Lawing's Persona

 Of greater import than the consideration of the government's witnesses is the concern that the jury may have convicted Ellen Campbell because of the outrageous and exorbitant lifestyle of Mark Lawing. A prominent portion of the trial was devoted to the revelation of Mark Lawing's lifestyle, but no comparison was provided to the jury of the "typical" lifestyle of a Lake Norman landowner. Painstaking inquiry was made into inconsequential details of the manner in which Lawing exhibited his persona.

The court believes that the conviction of Ellen Campbell stems from undue consideration by the jury of the conspicuous display of wealth by Mark Lawing. Indeed, a preoccupation with the minutia of Mark Lawing's life remains. For example the government still refers to his daytime beer-drinking, while the defendant assiduously points out that he had a "Support Your Local Sheriff" bumper sticker.

### D. Order for New Trial

The brief of the government focuses rather exclusively on the actions of Ellen Campbell. No comparable statement can be made about the focus of the government's presentation at the trial. A denial of the defendant's motion for a new trial would sustain convictions based upon considerations extraneous to the conduct of the defendant and upon a failure by the defendant to meet the standards of good business judgment. Therefore, should the judgment of acquittal be reversed on appeal, the court would exercise its expanded authority to weigh the evidence and preserve the fundamental right of the defendant to a fair trial by granting the defendant a new trial.

\* \* \*

### V. Defendant's Constitutional Challenge

The defendant urges that the two statutes involved in Counts I and II of her indictment are unconstitutional and void for vagueness as applied in this case. In light of this court's rulings on the Rule 29 and Rule 33 motions it is not appropriate or necessary to rule on this constitutional issue.

### VI. Conclusion

The Court has previously denied Ellen Campbell's motion for acquittal on the charge of filing a false HUD-1 report, a ruling undisturbed by this order. However, Ellen Campbell's guilt of that offense does not justify conviction for every other charge which might be tangentially related to her criminal conduct. As stated by the *Jackson* Court:

> The question whether a defendant has been convicted upon inadequate evidence is central to the basic question of guilt or innocence. The constitutional necessity of proof beyond a reasonable doubt is not confined to those defendants who are morally blameless.... Under our system of criminal justice even a thief is entitled to complain that he has been unconstitutionally convicted ... as a burglar. 443 U.S. at 323–324, 99 S.Ct. at 2791–92.

---

7. The defendant does correctly point out that Lawing was less than candid concerning the largely irrelevant revocation of his bond [D' bf. top p. 19].

An order setting aside the jury verdicts of guilty as to Count One and Count Two of the Indictment will be filed contemporaneously with this opinion.