UNITED STATES of America,
Plaintiff–Appellee,

v.

Harry C. KAUFMANN, Defendant–
Appellant.

No. 92–1463.

United States Court of Appeals,
Seventh Circuit.

Submitted Aug. 26, 1992.

Decided Feb. 2, 1993.

Mel S. Johnson, Asst. U.S. Atty., Office of the U.S. Atty., Milwaukee, WI, for plaintiff-appellee.

Marna M. Tess–Mattner, Franklyn M. Gimbel, Raymond M. Dall'Osto, Gimbel, Reilly, Guerin & Brown, James Collis, Milwaukee, WI, for defendant-appellant.

Before CUMMINGS and EASTERBROOK, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FAIRCHILD, Senior Circuit Judge.

Harry C. Kaufmann is the owner of Kaufmann Motorcars, Inc. ("Kaufmann Motors") in Milwaukee, Wisconsin. On September 11, 1990, a grand jury indicted Kaufmann on four counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B), and one count of attempted money laundering in violation of 18 U.S.C. § 1956(a)(3)(B). A jury acquitted Kaufmann on counts one and two, was unable to reach a verdict on counts three and four, and convicted Kaufmann on count five for attempted money laundering. Kaufmann was sentenced on the count of conviction and appealed. Because two counts of the indictment remained unresolved, we held that the judgment was not final and therefore we lacked appellate jurisdiction. *United States v. Kaufmann*, 951 F.2d 793 (7th Cir.1992). Following dismissal of the appeal, the government moved the district court to dismiss the open counts of the indictment without prejudice, pursuant to Fed.R.Crim.P. 48(a). The district court granted the government's motion and the defendant filed a notice of appeal from the judgment and sentence on count five. At the request of the parties, we first considered whether we would have jurisdiction where two counts of the five count indictment were dismissed without prejudice. We decided that we do have jurisdiction, *United States v. Kaufmann*, No. 92–1463 (7th Cir. July 2, 1992) (unpublished order), the substance of which we include in this opinion. The parties then filed supplemental briefs. We affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

Defendant–Appellant Harry C. Kaufmann owns Kaufmann Motors, an automobile dealership in Milwaukee, Wisconsin that specializes in selling luxury and exotic automobiles such as Excalibur, Zimmer, De Lorean and Mercedes Benz. Through his course of dealings in the automobile business, Kaufmann was friendly with a man by the name of Tom Schafer. Schafer was aware that federal authorities might charge him in connection with the passing of counterfeit money. Schafer agreed to cooperate with law enforcement agents with the hope of receiving consideration with regard to the counterfeiting charges. In particular, he agreed to assist the Internal Revenue Service ("IRS") in a "sting" operation directed at Kaufmann by setting up a sale of an automobile to a purported drug dealer. Schafer had a number of conversations with Kaufmann in this regard that were recorded on audiotape. At the trial, Kaufmann and Schafer provided contradictory testimony concerning the number and content of additional unrecorded conversations.

At the IRS agents' instruction, Schafer told Kaufmann about a "friend" of his, Tom Ryder—who, unknown to Kaufmann, was IRS Special Agent Greg Myre. According to the pre-arranged story, Schafer told Kaufmann that Ryder was a marijuana dealer from Minneapolis who was interested in purchasing a Porsche 911 automobile.

Schafer stated that the purchase had to be in cash and the car titled in someone else's name. Kaufmann agreed to sell the Porsche under these terms for $40,000. At a later meeting, Schafer provided a letter to Kaufmann, purportedly written by "Ryder" and addressed to Schafer. The letter provided, in pertinent part:

If you can set this up, I'll make your time worth while, but here's what I need from your guy. Number one, the whole deal is cash, period. Number two, I want the car titled in a friend's name. Will I need to have him there? Number three, my name must never come out. Number four, your guy's cool about my business? PS, make sure your guy understands that the arrangements are more important than the price.

During this meeting, Kaufmann acknowledged that Schafer's friend was "in an illegitimate business." Schafer commented, "He's just a marijuana dealer.... Not high profile. Real low profile." In response, Kaufmann told Schafer that he had supported himself when he was a kid, "dealing coke and crystal." Kaufmann also stated that he was willing to title the car in the name of someone else, and that the titleholder need not be present at the dealership.

In February of 1990, Schafer first brought Myre to the dealership, although Kaufmann was not in the store that day. On March 29, 1990, Myre returned to the dealership, along with IRS Special Agent Rich Ahern, posing as Rick Adams (hereinafter referred to by their true names, "Myre" and "Ahern"). Myre carried a briefcase containing approximately $45,000 to $50,000 in cash. During the course of their conversation, Myre informed Kaufmann that he wished to purchase the Porsche in cash, and directed that title be put in Ahern's name. Kaufmann agreed, commenting, "[T]hat's between you guys" and later stated, "I really don't even want to know about it." Kaufmann and Myre also discussed the filing of Form 8300, a form required to be filed with the IRS when a transaction involves more than $10,000 in cash.[1] Myre made it clear that

1. In particular, the following conversation occurred:

Kaufmann: Um, OK, if I understand what Tom told me, you're the gentleman buying this Porsche?
Ahern: Yeah, we'll put my name on it.
Kaufmann: OK.
Myre: Yeah. I want the car, but I want to put it in his name.
Kaufmann: OK. Well, that's between you guys.

. . . . .

Kaufmann: OK. I mean, ah, and you're paying for the car in cash or what are we doing?
Myre: Cash is all I got.
Kaufmann: OK. And I explained to Tom that you have to fill out a Currency Transaction Report.
Myre: Yeah, I know that they got this government form that everybody's dealing in now, is that absolutely necessary?
Kaufmann: Absolutely necessary.
Myre: OK.
Kaufmann: They will close me up otherwise. What happens is, then I'm involved what is called conspiracy. A friend of mine just lost a dealership in Florida. _____ to sell a car _____ and I explained that to Tom.
Myre: Well, he said that you had mentioned that you had this form we're going to have to deal with.
Kaufmann: Yes.

Myre: Alright. How can we deal with it then? I don't want my name on anything, if it's possible.
Kaufmann: Well, if you're not buying the car, then your name wouldn't be on anything. His name would be on everything.

. . . . .

Kaufmann: If it's over $10,000, I mean if I sold your car, which I can't, for 11,400 or sold your car for, you know, 77,000, either way the form has to be filled out.
Myre: So even though it's my cash, he can put his name on the form, right?
Kaufmann: I'm not an attorney. As far as I'm concerned, he's buying the car.
Myre: OK, that's fine.
Kaufmann: I mean, I don't know. Tom told me that he was buying the car, so I don't know, that's between you two guys.
Myre: As long as my name isn't associated with it, it's great.
Kaufmann: You're not buying the car, sir, then your name wouldn't need to be associated with anything.
Myre: Right.

. . . . .

Kaufmann: ... all I can't do and I have no interest in doing, is getting involved in any commotion, but if he is purchasing the vehicle, if he is paying me for the vehicle, that's fine.

he did not want his name to appear on any of the paperwork involved in the transaction. Kaufmann told the agents that he must file the form, but agreed to complete the form in Ahern's name. Myre additionally told Kaufmann that he had brought cash in an assortment of denominations, and Kaufmann responded, "That's most likely what I figured." Agent Ahern did not actively participate in this discussion and Myre retained possession of the briefcase throughout their meeting.

After the terms were agreed upon, Kaufmann began to prepare the sales forms. However, before the transaction could be completed, IRS agents entered the office, identified themselves, and purported to "arrest" Myre. Kaufmann was unaware at this time that Myre and Ahern were agents. He told the arresting agents that Myre was in the process of buying an automobile and that he had just begun to fill out the currency report. An arresting agent asked Kaufmann whether it was Myre or Ahern who had brought the money, and Kaufmann responded, "To be honest with you, I can't tell you." This was the last contact Kaufmann had with the agents.

On March 31, 1990—two days after the meeting with Myre and Ahern—Kaufmann asked to meet with Schafer at John Hawk's Pub. This meeting lasted approximately two hours and was also recorded. During this conversation, Kaufmann told Schafer that he was worried that he was in legal trouble, and stated, "I would take a personal vendetta against somebody that got me involved and I've got enough money to cause a guy some hardship."

At trial, the audiotape of the conversations was played for the jury. As well, Schafer and Myre testified in some detail about the "sting" operation. Kaufmann also testified at trial, although his testimony differed in many respects. According to Kaufmann, Schafer had told him that his friend was coming to Milwaukee to buy and sell real estate. Schafer told him that this friend wanted to purchase a Porsche with cash and title the car in another's name so that his wife—whom he was divorcing—would not know he had purchased a car.

On September 11, 1990, a grand jury indicted Kaufmann on four counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)[2] and one count of attempted money laundering in violation of 18 U.S.C. § 1956(a)(3)(B). Count five, the only count before us, alleged that Kaufmann attempted to conduct a financial transaction involving property represented by law enforcement officers to be the proceeds of specified unlawful activity, with the intent to conceal and disguise the nature, location, source, ownership, or control of the property believed to be the proceeds of specified unlawful activity. The financial transaction attempted was the sale of a Porsche automobile to an undercover agent of the

Myre: OK.

. . . . .

Myre: I'll make it worth your while, buddy. See, basically all I'm going to do here, he's going to have the car, we want it titled to him.
Kaufmann: I really don't even want to know about it.
Myre: OK, that's fine. Cuz it's ...

. . . . .

Ahern: How do you know, on this, how do you know if I'm going to give you the right information on it?
Kaufmann: Cuz I need identification, sir?
Ahern: OK.
Kaufmann: Yeah, I have to have identification.
Ahern: _____ no big problem.

. . . . .

2. To obtain a conviction for money laundering under 18 U.S.C. § 1956(a)(1)(B), the government must prove that a defendant: (1) knowingly conducted a financial transaction; (2) which he knew involved funds derived from criminal activity and which in fact involved the proceeds of drug distribution; (3) with knowledge that the transaction was designed to disguise the nature or source of the proceeds. *See United States v. Jackson*, 935 F.2d 832, 838–39 (7th Cir.1991); *United States v. Brown*, 944 F.2d 1377, 1387 (7th Cir.1991).

In counts one through four, Kaufmann was alleged to have conducted automobile sales involving the proceeds of drug trafficking, knowing that the money involved was the proceeds of unlawful activity and that the transactions were designed to conceal the nature and source of those proceeds. Counts one and two involved sales to Jerome Mann and Billy Cannon, respectively. Counts three and four involved two sales to James Verser.

Criminal Investigation Division of the IRS. The completion of the sale was frustrated by the "arrest."

The jury returned a verdict of not guilty on counts one and two and a verdict of guilty on count five. The jury was unable to reach a verdict on counts three and four, and Judge Warren granted a mistrial as to these counts. Kaufmann was sentenced to 46 months in prison with a $30,000 fine on count five. This sentence was based, in part, on a two level enhancement for obstruction of justice. Judge Warren based the enhancement on three findings of obstruction of justice that had been recommended in the Pre–Sentence Investigation Report ("PSI"). First, he found that Kaufmann had threatened Schafer; second, that Kaufmann had provided false testimony; and third, that Kaufmann had made a false statement to law enforcement officers when they "arrested" Myre. Judge Warren stayed the execution of the sentence pending appeal. Kaufmann appealed.

We initially held on appeal that the judgment was not final because two counts of the indictment remained unresolved, and we therefore did not have appellate jurisdiction. *Kaufmann*, 951 F.2d 793. Following dismissal of the appeal, the government moved the district court to dismiss the open counts of the indictment without prejudice, pursuant to Fed.R.Crim.P. 48(a). The district court granted the government's motion and the defendant filed a notice of appeal from the judgment and sentence on count five. In an unpublished order, we held that the dismissal without prejudice of the unresolved counts, where there was no evidence that the parties or district judge were attempting to deliberately circumvent the rules of procedure to "create" appellate jurisdiction, rendered the judgment final and appealable. *Kaufmann*, No. 92–1463, slip op. at 10 (7th Cir. July 2, 1992) (unpublished order). We concluded that we had jurisdiction to hear the appeal.

Kaufmann raises a number of contentions regarding the propriety of his conviction and sentence under count five.

## II. DISCUSSION

### A. JURISDICTION

■ On an earlier date, we dismissed the defendant's appeal for lack of appellate jurisdiction. Following dismissal of the appeal, the government moved the district court to dismiss the open counts of the indictment without prejudice, pursuant to Fed.R.Crim.P. 48(a). The district court granted the government's motion and defendant filed a notice of appeal from the judgment and sentence on count five. The government has called our attention to our recent decision in *Horwitz v. Alloy Automotive Co.*, 957 F.2d 1431 (7th Cir.1992), perhaps suggesting we consider whether a dismissal without prejudice might prevent finality.

The dismissal of the two counts without prejudice does not bar a new indictment. Does that mean the judgment on the count of conviction is not yet final? We have found no decision in a criminal case so holding. Rule 48(a) provides that, upon dismissal of an indictment by the United States Attorney, "the prosecution shall thereupon terminate."

Any analogy to a civil case in this respect is imperfect. A new civil action can be commenced at the will of the plaintiff. In a criminal case involving charges similar to those in this case, the government must secure an indictment. Leaving that fact aside, we have found no decision in a civil case that a judgment on the merits of one or more claims is not final if all other claims in the complaint have been dismissed without prejudice. To the contrary, the Eighth Circuit in *Chrysler Motors Corp. v. Thomas Auto Co.*, 939 F.2d 538, 540 (8th Cir.1991) has held that dismissal without prejudice of claims not decided on the merits renders a partial summary judgment on the other claims a final judgment for purposes of appeal.

*Horwitz* did not announce a principle that dismissal of some claims without prejudice deprives a judgment on the merits of all other claims of finality for purposes of appeal. Rather, the court concentrated on

the intent of the district court and the parties to bypass the rules.

The civil action in *Horwitz* was based upon a complaint including seven counts. The district court granted a partial summary judgment for the defendants and dismissed four of the counts based on the doctrine of *res judicata.* The plaintiff sought to bring an immediate appeal on the dismissal of the four counts. The parties and the district judge, voicing his belief that this court would not accept an interlocutory appeal via 28 U.S.C. § 1292(b), nor accept finality via Rule 54(b), devised a plan to create a final appealable order. The district judge and the parties agreed to dismiss both the plaintiff's remaining counts and the defendant's counterclaim without prejudice to refiling. *Id.* at 1432–33. The parties and the district judge simply endeavored to get an interlocutory appeal on the four previously dismissed counts by "creating" a final order; they did not contemplate that the voluntary dismissal without prejudice would terminate the litigation. *Id.* at 1435. On appeal, this court found that, indeed, the unconditional reinstatement was contemplated by the parties. *Id.* at 1436. We held that the judgment so created was not final and, therefore, not appealable.

The parties in this case entered an agreement in which the government stated that it would dismiss counts three and four without prejudice and the defendant stated that he would file a notice of appeal on the count of conviction. There is no evidence here that the parties and the district judge were attempting deliberately to circumvent the rules of procedure to "create" appellate jurisdiction. Although the government is free to seek a new indictment on the dismissed counts, there is nothing to indicate its intention to do so.

In our prior opinion dismissing the appeal in this case, we stated, "If counts three and four are dismissed upon the government's motion, and if the defendant again files a notice of appeal, then in the interest of judicial economy the same panel will decide the appeal on the same briefs, without further oral argument." *Kauf-*

*mann,* 951 F.2d at 796. The government argues that this statement indicates that the jurisdictional issue had been decided on the prior appeal. In our earlier opinion, we did not specify that the dismissal must be with prejudice in order to make the judgment final and, thus, may have implied that a dismissal without prejudice could make the judgment final and appealable. While our statement is arguably law of the case, which "encompasses a court's explicit decisions, as well as those issues decided by necessary implication," *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.,* 810 F.2d 243, 250 (D.C.Cir.1987), here it was intended merely as a vehicle to expedite any immediate subsequent appeal due to a dismissal and did not necessarily imply that we had considered the issue of whether dismissal without prejudice would prevent finality. However, because the government's action in dismissing the remaining counts was in response to our suggestion, it can be distinguished from the *Horwitz* parties' attempt to bypass, rather than follow, the rules.

Finally, our prior decision dismissing the appeal for lack of jurisdiction followed *United States v. Kalinowski,* 890 F.2d 878 (7th Cir.1989) and *United States v. Patel,* 835 F.2d 708 (7th Cir.1987). So far as we are aware, neither of these decisions has been followed by our sister circuits. In fact, several circuits have, without addressing the question of appellate jurisdiction, entertained an appeal on one count of a criminal indictment while other counts of the indictment were unresolved. *See United States v. Cicco,* 938 F.2d 441, 442 n. 1 (3d Cir.1991); *United States v. Bay State Ambulance & Hosp. Rental Serv., Inc.,* 874 F.2d 20, 22 (1st Cir.1989); and *United States v. Richardson,* 817 F.2d 886, 887 (D.C.Cir.1987). In light of the apparent novelty of our approach to the matter of finality in this area in criminal cases, we decline to extend it any further.

## B. SUFFICIENCY OF THE EVIDENCE

■ Kaufmann was convicted on count five for violating 18 U.S.C. § 1956(a)(3)(B), which defines an offense:

Whoever with the intent to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity ... conducts or attempts to conduct a financial transaction involving property represented by a law enforcement officer to be the proceeds of specified unlawful activity, or property used to conduct or facilitate specified unlawful activity....

The statute further defines the term "represented" as "any representation made by a law enforcement officer or by another person at the direction of, or with the approval of, a Federal official authorized to investigate or prosecute violations of this section." 18 U.S.C. § 1956(a)(3).[3]

■ Kaufmann asserts that the evidence is insufficient to support his conviction. In challenging the sufficiency of the evidence, Kaufmann bears a heavy burden. *United States v. Anagnostou*, 974 F.2d 939, 943 (7th Cir.1992) (citing *United States v. Davis*, 890 F.2d 1373, 1377 (7th Cir.1989), *cert. denied*, 493 U.S. 1092, 110 S.Ct. 1165, 107 L.Ed.2d 1068 (1990)). The court will uphold the conviction if the evidence, viewed in the light most favorable to the government, establishes that any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Anagnostou*, 974 F.2d at 943. On appeal, we do not reweigh the evidence or assess the credibility of witnesses. *Id.*

■ The critical issues Kaufmann raises on appeal are whether there was evidence: (1) that the undercover agents and Schafer, an informant acting at the direction or with the approval of a federal law enforcement officer, had "represented" the cash to be the proceeds of marijuana dealings; (2) that Kaufmann in fact believed the cash

was drug proceeds; and (3) that Kaufmann intended to conceal or disguise the nature, source, or ownership of the property believed to be the proceeds of specified unlawful activity. Reviewing the evidence in the light most favorable to the government, as we must .on appeal, we are not persuaded by Kaufmann's claims that the evidence was insufficient.

■ First, we address whether the agents represented that the cash was proceeds of marijuana dealings. Relevant to this inquiry is whether the language Congress used—"represented ... to be the proceeds of specified unlawful activity"—should be construed to require an express statement by the agents or Schafer or whether a conviction can be sustained where there are statements and conduct from which a reasonable person would infer that the money was drug proceeds. A representation is "[a]ny conduct capable of being turned into a statement of fact." BLACK'S LAW DICTIONARY 1301 (6th ed. 1990) (citing *Scandrett v. Greenhouse*, 244 Wis. 108, 11 N.W.2d 510 (1943)). A representation, therefore, encompasses a broader range of communication than specific statements. We do not believe that Congress intended for the term "representation" to be narrowly read as requiring an express statement by government agents. Such a reading of § 1956(a) surely would place an unreasonable burden on a government agent's ability to enforce the statute:

> To hold that a government agent must recite the alleged illegal source of [the] ... property at the time he attempts to transfer it in a "sting" operation would make enforcement of the statute extremely and unnecessarily difficult; "legitimate criminals," whom undercover agents must imitate, undoubtedly would not make such recitations before each transaction.

---

**3.** Section 1956 defines the term "transaction" to include "a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition...." 18 U.S.C. § 1956(c)(3). A "financial transaction", as defined by the statute, means "(A) a transaction (i) involving the movement of funds by wire or other means or (ii) involving one or more monetary instruments, which in any way

or degree affects interstate or foreign commerce...." 18 U.S.C. § 1956(c)(4). In this case, the transaction involved the sale of a Porsche automobile. This transaction fit within the definition of "financial transaction" because it involved cash and because the sale would have some effect on interstate or foreign commerce.

*United States v. Arditti*, 955 F.2d 331, 339 (5th Cir.), *cert. denied,* — U.S. ——, 113 S.Ct. 597, 121 L.Ed.2d 534 (1992). It is enough that the government prove that an enforcement officer or authorized person made the defendant aware of circumstances from which a reasonable person would infer that the property was drug proceeds.

In this case, there is no evidence of an express statement to Kaufmann that the cash to be used in purchasing the Porsche was the proceeds of marijuana sales. To the contrary, Schafer and the agents testified that they never specifically told Kaufmann that the money came from drug proceeds. There were, however, statements of various facts from which a reasonable person would almost certainly infer that drug proceeds were involved. The evidence demonstrates that Schafer told Kaufmann that the man interested in purchasing the $40,000 Porsche had to pay cash and that he wanted the car titled in a name other than his own. Schafer also told Kaufmann that this man was a marijuana dealer. To buttress these statements, Schafer supplied a letter to Kaufmann, purported to be from the interested buyer. In this letter, Myre stated that the purchase in cash and the titling in another's name were more important considerations than the price. The letter states, in pertinent part:

> If you can set this up, I'll make your time worth while, but here's what I need from your guy. Number one, the whole deal is cash, period. Number two, I want the car titled in a friend's name. Will I need to have him there? Number three, my name must never come out. Number four, your guy's cool about my business? PS, make sure your guy understands that the arrangements are more important than the price.

At a subsequent date, Myre, posing as the purchaser, arrived at the dealership with a briefcase containing cash in an assortment of denominations. Myre directed that title be put in the name of Ahern and made it clear that he did not want his name to appear on any of the paperwork involved in the transaction. There is no indication that Myre was making a gift to Ahern or that Ahern would actually possess the automobile. While there is no evidence that Schafer or the agents made an explicit statement to Kaufmann that "this money comes from drug sales," the evidence, taken as a whole, sufficiently demonstrates that Schafer's and the agents' assertions gave Kaufmann or any reasonable person in his position a firm basis to believe that the money derived from drug sales. We think there was sufficient evidence for the jury to find that there had been a "representation" to that effect.

Kaufmann asserts that the evidence is insufficient to establish that he believed the money was drug proceeds. Kaufmann testified that Schafer told him that his "friend", Tom Ryder, was coming into town to look at some real estate; that Ryder was going through a divorce and for that reason did not want the automobile titled in his name; and that he was merely a "low profile" marijuana dealer. Kaufmann also testified that the informant's reference to marijuana did not mean much to him, especially since the informant tended to exaggerate. Coupled with the lack of an express statement from either Schafer or the agents, Kaufmann contends that he simply had no reason to believe that the money with which Myre was purchasing the car was drug proceeds.

At trial, however, Schafer testified that he did not believe he told Kaufmann of any family problems, and that he had no recollection of making assertions regarding Ryder's real estate dealings or divorce. Although there is some support in the record for Kaufmann's contentions,[4] the jury apparently did not find Kaufmann's testimony credible. Credibility determinations are given great weight and will not be disturbed on appeal. *United States v. Brown,* 944 F.2d 1377, 1379 (7th Cir.1991); *United States v. Beal,* 960 F.2d 629, 634 (7th Cir.), *cert. denied,* — U.S. ——, 113

---

**4.** During a meeting with Schafer, Kaufmann stated that he believed Myre was getting a divorce. Moreover, during the "sale," Kaufmann asked Myre whether he was married or single, and Myre responded that he was divorced.

S.Ct. 230, 121 L.Ed.2d 166 (1992). We believe there was sufficient evidence from which the jury could find not only a representation by Schafer and Myre that the money was drug proceeds, but also that Kaufmann believed it.

Kaufmann also contends that there is insufficient evidence that he intended to conceal or disguise the source of the proceeds. Kaufmann asserts that he repeatedly told Myre that he would file a Form 8300, that he would require identification from the titleholder, and that he did not wish to jeopardize his dealership by not properly completing and filing the Form 8300. While Kaufmann's recollection of the events is consistent with the taped conversations, we still conclude there was evidence from which the jury could find that Kaufmann intended to "conceal" the source of the proceeds. First, Kaufmann agreed to title the Porsche in Ahern's name. This in itself is not illegal, and there can be legitimate reasons for doing so. *See United States v. Antzoulatos*, 962 F.2d 720, 727 n. 4 (7th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 331, 121 L.Ed.2d 250 (1992). The circumstances here, however, demonstrate that Kaufmann was aware of the purchaser's motivation for titling the car in another's name—circumstances which cried out "concealment"—"my name must never come out;" payment in cash; anonymity; Kaufmann's need to be "cool" about Myre's business, and that these considerations were more important than the price. In aid of Myre's anonymity, Kaufmann was willing to complete the Form 8300 Report of Cash Payments Over $10,000, showing Ahern as the "Individual or Organization for Whom this Transaction was Completed." Even under Kaufmann's suggestion that titling in Ahern's name was requested because of Myre's pending divorce, the purpose was concealment of the asset, albeit from Myre's wife. The jury could scarcely find otherwise than an intent to conceal Myre's ownership of the funds and car.

Relying upon *United States v. Sanders*, 929 F.2d 1466 (10th Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991) and *United States v. Campbell*, 777 F.Supp. 1259, 1264 (W.D.N.C.1991), *aff'd in part and rev'd in part*, 977 F.2d 854 (4th Cir.1992), Kaufmann argues that placing title of a car in the name of someone other than the purchaser cannot prove an intent to conceal under § 1956(a)(3)(B). However, in both *Sanders* and *Campbell*, the courts addressed whether the defendant knew that the transaction was designed to conceal the source of the unlawful proceeds under § 1956(a)(1)(B), and not the issue Kaufmann raises on appeal—whether the defendant intended to conceal the source or ownership of the drug proceeds. In any event, the cases are readily distinguished on their facts.

In *Sanders*, the court of appeals held that the titling of an automobile in a family member's name was insufficient evidence of a design to conceal where other actions of the purchaser served to identify the relationship between the true buyer, the property and the cash. *Sanders*, 929 F.2d at 1472–73. In our case, however, there is nothing to suggest a familial relationship between Myre and Ahern; nor is there evidence indicating any relationship between Myre and Ahern that would serve to identify the connection between Myre, the Porsche and the cash. . In *Campbell*, the district court held that, as a matter of law, there was insufficient evidence of defendant's knowledge of a design to conceal where the purchaser appeared at every meeting, where he personally brought the alleged drug money, and where he placed title to the purchased real estate in his parents' name. However, during the pendency of this appeal, the Fourth Circuit reversed in part the district court's judgment.[5] *Campbell*, 977 F.2d 854. In reversing, the court found it unnecessary to

---

5. In *Campbell*, the Court of Appeals held that evidence that the defendant, a real estate agent, knew that her client drove new automobiles and flashed large amounts of cash, stated that his money "might have been drug money" and participated in a real estate transaction in which the client failed to disclose a large cash downpayment was sufficient to create a jury question as to whether the defendant knew of (or was willfully blind to) the illegal source of the money and knew that the purpose of the transaction was to conceal illegal proceeds. *Id.* at 858–59.

determine whether the purchaser had concealed the ownership of the funds by placing title to the real estate in the name of his parents. *Id.* at 858 n. 4. As such, *Campbell* offers no guidance on this point.

"We must affirm unless the record is barren of any evidence, regardless of weight, from which the trier of fact could find guilt beyond a reasonable doubt." *Brown,* 944 F.2d at 1388 (quoting *United States v. Jackson,* 935 F.2d 832, 840 (7th Cir.1991) (citations omitted)). Kaufmann has not met this burden. Here, there was sufficient evidence that Myre and Schafer "represented" that the money was proceeds from drug transactions, that Kaufmann believed this to be so, and that Kaufmann intended to conceal the source and ownership of the property. A rational jury could have found Kaufmann guilty of an attempt to violate 18 U.S.C. § 1956(a)(3)(B).

Kaufmann raises a number of other contentions regarding the propriety of his conviction and sentence.

## C. CONSTITUTIONALITY OF SECTION 1956(a)(3)(B)

Kaufmann attacks the constitutionality of 18 U.S.C. § 1956(a)(3)(B), contending that the statute is both overbroad and void for vagueness.

### 1. Overbreadth Challenge

A facial challenge to the breadth of a statute may be brought when First Amendment rights are at stake. Kaufmann contends that his first amendment rights to freedom of association and freedom of expression are at stake here. In response, the Government argues that the interest Kaufmann seeks to protect is merely the ability to conduct a business transaction.

▬ There are two lines of cases where a possible impairment of the right to freedom of association is considered: (1) where certain intimate human relationships or a fundamental element of personal liberty are at stake; or (2) where the right to associate for the purpose of engaging in activities protected by the first amendment are involved—*i.e.,* speech, assembly, petition for redress of grievances, or religion.

*See Roberts v. United States Jaycees,* 468 U.S. 609, 617–18, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984). Here, the statute does not impair an intimate human relationship nor an association for the purpose of engaging in an activity protected by the first amendment. Moreover, even if the statute posed some barrier to freedom of association (which it does not), it is clear that it does not impose a "substantial interference," as is required to strike a statute on overbreadth grounds.

▬ Kaufmann also contends that the statute infringes upon his freedom of expression. The speech at issue here is commercial in nature. Commercial speech is not open to an overbreadth analysis. *Record Head Corp. v. Sachen,* 682 F.2d 672 (7th Cir.1982); *Bates v. State Bar of Arizona,* 433 U.S. 350, 380–81, 97 S.Ct. 2691, 2707, 53 L.Ed.2d 810 (1977); *Shapero v. Kentucky Bar Ass'n,* 486 U.S. 466, 478, 108 S.Ct. 1916, 1924, 100 L.Ed.2d 475 (1988) (Brennan, *J.,* joined by Marshall, Blackmun, and Kennedy, *JJ.*); *but see San Francisco Arts & Athletics, Inc. v. United States Olympic Comm.,* 483 U.S. 522, 536–37 n. 15, 107 S.Ct. 2971, 2981 n. 15, 97 L.Ed.2d 427 (1987) (doctrine as applied to commercial speech is "highly questionable"). Because § 1956 does not implicate constitutionally protected conduct, Kaufmann's overbreadth challenge fails. *See United States v. Gleave,* 786 F.Supp. 258, 267–68 (W.D.N.Y.1992) (§ 1956 not unconstitutionally overbroad); *United States v. Mainieri,* 691 F.Supp. 1394, 1397 (S.D.Fla.1988) (§ 1956 does not implicate constitutionally protected conduct).

### 2. Vagueness Challenge

▬ Kaufmann challenges § 1956(a)(3)(B) on vagueness grounds. The void-for-vagueness doctrine requires that "a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson,* 461 U.S. 352, 357, 103 S.Ct. 1855, 1858, 75

L.Ed.2d 903 (1983). The most important aspect of the doctrine is the requirement that the legislature establish minimal guidelines to govern the discretion of law enforcement officials. *Id.* at 358, 103 S.Ct. at 1858. The vagueness of statutes that do not threaten First Amendment interests is examined in light of the facts at hand. *Maynard v. Cartwright,* 486 U.S. 356, 361, 108 S.Ct. 1853, 1857, 100 L.Ed.2d 372 (1988).

We initially note that this court and others have ruled that § 1956(a)(1)(B) is not void for vagueness, both on its face and as applied to facts similar to those at hand. *See Antzoulatos,* 962 F.2d 720; *Jackson,* 935 F.2d 832; *United States v. Long,* 977 F.2d 1264, 1273 (8th Cir.1992); *United States v. Gilliam,* 975 F.2d 1050, 1056–57 (4th Cir.1992); *United States v. Awan,* 966 F.2d 1415, 1424–25 (11th Cir.1992); *Gleave,* 786 F.Supp. at 268–70; *United States v. Sierra–Garcia,* 760 F.Supp. 252, 258–59 (E.D.N.Y.1991); *United States v. Kimball,* 711 F.Supp. 1031, 1034 (D.Nev.1989); *United States v. Ortiz,* 738 F.Supp. 1394 (S.D.Fla.1990).

An examination of § 1956(a)(3)(B) reveals that this provision is unambiguous as well. Under this provision, the government must prove that Kaufmann had the specific intent to conceal or disguise the nature, location, source, ownership, or control of property he believed to be the proceeds of unlawful activity; that representations to that effect were made by law enforcement officers, or by those acting under their direction; and that the representations relate to specified unlawful conduct enumerated in § 1956(c)(7). Of course, under this provision, an ordinary person will not know that he is receiving representations from law enforcement officers or an authorized informant. However, the statute provides adequate notice that if he believes the property is the proceeds of specified unlawful activity, he incurs a high risk of liability if he conducts a financial transaction with the intent to conceal its ownership. This provision is not written in a manner that would encourage arbitrary and discriminatory enforcement, *see Kolender,* 461 U.S. at 357, 103 S.Ct. at 1858, nor would an ordinary

person be unable to understand what conduct is prohibited. As such, we conclude that § 1956(a)(3)(B) is not void for vagueness. *See United States v. Loehr,* 966 F.2d 201, 203–04 (6th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 655, 121 L.Ed.2d 582 (1992) (§ 1956(a)(3)(B) not void for vagueness).

## D. OSTRICH INSTRUCTION

 Kaufmann challenges the district court's use of what is commonly known as an "ostrich instruction." The district court read the following instruction to the jury:

> You may infer knowledge from a combination of suspicions, and indifference to the truth. If you find that a person had a strong suspicion that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly. . . .

This instruction related directly to the other counts on trial, where knowledge was an element of the offense. Kaufmann claims error because the jury was not told that this instruction did not apply to count five and because the jury received no instruction defining the term "belief". Due to this lack of clarity in instructions, Kaufmann urges, the jury was likely to have relied on the definition of "knowledge" when it found Kaufmann to have believed that the cash was proceeds of an unlawful activity.

 We presume that juries abide by the court's instructions. *See United States v. Bell,* 980 F.2d 1095, 1098 (7th Cir.1992); *United States v. McKinney,* 954 F.2d 471, 478 (7th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 662, 121 L.Ed.2d 587 (1992). The court clearly instructed the jury that it must find that Kaufmann believed the cash to be proceeds of an unlawful activity in order to convict under count five. Nothing in the instructions gave the jury the impression that "knowledge" was an element under count five and, furthermore, there is no indication that the jury

found "belief" under count five only by finding strong suspicion plus indifference.[6]

## E. SIXTH AMENDMENT RIGHT TO CONFRONTATION

■■■ Kaufmann contends that the district court denied him the right to effective cross-examination by permitting Schafer to testify and by limiting Kaufmann's ability to cross-examine Schafer concerning his alleged criminal conduct. Kaufmann contends that under *United States v. Anderson*, 881 F.2d 1128 (D.C.Cir.1989), evidence of Schafer's criminal conduct was admissible as evidence of his motive and bias. In *Anderson*, the defendant sought to cross-examine a witness regarding a murder charge that had been dismissed without prejudice. Because there was no evidence of an actual cooperation agreement between the witness and the prosecution, the district court refused to permit the cross-examination. The appellate court reversed. The court reasoned, "[e]vidence that a prosecution witness is subject to reindictment by the prosecution is, by itself, probative of potential bias and is therefore a proper subject of cross-examination under the Confrontation Clause." *Id.* at 1139. Because the dismissed charge "hung over the witness' head like the sword of Damocles," the court concluded that defense counsel should have been permitted to cross-examine the witness. *Id.*

During the trial, the district judge conducted voir dire outside the presence of the jury. When counsel for Kaufmann questioned Schafer regarding his past criminal conduct, Schafer invoked his fifth amendment right against self-incrimination. In particular, Schafer would not respond to questions concerning whether he had engaged in the delivery of cocaine, whether he had engaged in transactions involving the preparation of false and fraudulent documents to defeat a purchaser's state sales tax obligation on an automobile purchase, and whether he had produced his 1987, 1988 and 1989 tax returns for defense counsel.

In anticipation of the testimony Schafer would give at trial, Kaufmann moved to strike his testimony. The district judge denied the motion and allowed Schafer to testify before the jury. The judge also limited cross-examination of Schafer's motive and bias to documents referring to the potential counterfeiting charges against him. In particular, the district judge found that the admission of two letters concerning the charges would be sufficient to inform the jury of any possible bias. As to the other allegations of criminal conduct Kaufmann sought to use on cross-examination, the judge found they were collateral in nature and that impeachment on those charges was not central to Schafer's credibility.

■■■ Whether a defendant has the ability to effectively cross-examine a witness turns on "whether the jury has sufficient information to make a discriminating appraisal of a witness' motive and bias." *United States v. Williams*, 858 F.2d 1218, 1223 (7th Cir.1988), *cert. denied*, 488 U.S. 1010, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989) (quoting *United States v. Rodgers*, 755 F.2d 533, 548 (7th Cir.), *cert. denied*, 473 U.S. 907, 105 S.Ct. 3532, 87 L.Ed.2d 656 (1985)). The district court is given wide latitude insofar as the confrontation clause is concerned to impose reasonable limits on cross-examination based on other concerns, such as prejudice to the defendant, or when the questioning would be marginally relevant. *See Williams*, 858 F.2d at 1223; *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986). "When a witness refuses to answer

---

**6.** In any light, the ostrich instruction was appropriate for counts one through four. This circuit has consistently upheld the use of an ostrich instruction, recognizing that wilful blindness or conscious avoidance is the legal equivalent to knowledge. *Antzoulatos*, 962 F.2d at 724–25 (upheld as applied to 18 U.S.C. § 1956(a)(1)(B)); *see also United States v. Ramsey*, 785 F.2d 184, 189–90 (7th Cir.), *cert. denied*, 476 U.S. 1186, 106 S.Ct. 2924, 91 L.Ed.2d 552 (1986); *United States v. Valencia*, 907 F.2d 671, 679 (7th Cir.1990); *see also United States v. Breque*, 964 F.2d 381, 387–88 (5th Cir.1992), *petition for cert. filed* (Oct. 26, 1992) (no error in giving deliberate ignorance instruction in relation to § 1956(a)(3)). In fact, the court in *Ramsey* recommended the use of an instruction identical to the one used here. *Ramsey*, 785 F.2d at 190.

questions based on fifth amendment privilege, striking the witness' entire testimony is an extreme sanction." *United States v. Lord*, 711 F.2d 887, 892 (9th Cir.1983), *quoted in United States v. Zapata*, 871 F.2d 616, 624 (7th Cir.1989). However, where the witness' refusal to answer relates only to collateral matters, such as credibility, there is little danger to the defendant. *Zapata*, 871 F.2d at 624. It is within the district court's discretion to strike a balance between the defendant's confrontation right and the witness' privilege against self-incrimination, and shall be reversed only upon a finding that the district court abused its discretion. *Id.*

At trial, Schafer testified that he was the subject of a counterfeiting investigation, that he had agreed to cooperate with the government, and that he had waived the statute of limitations for six months. When questioned about whether he had fabricated or falsified any documents, Schafer then invoked the fifth amendment. Based on this testimony, the jury was aware that Schafer was the subject of a counterfeit investigation and that the charge hung over him like "a sword of Damocles". As a result, the jury had sufficient information to make a discriminating appraisal of Schafer's motive and bias. Further questioning on cross would have been fruitless here, where Schafer had invoked his fifth amendment rights concerning the merits of the charge. In striking this balance between Kaufmann's right to confrontation and Schafer's privilege against self-incrimination, the district court did not abuse its discretion.

## F. EXCLUSION OF SUBSEQUENT REVISIONS TO IRS FORM 8300

The IRS Form 8300, "Report of Cash Payments Over $10,000 Received in a Trade or Business," was revised in 1985, and was used by Kaufmann in the transactions identified in the indictment. The form was again revised in January, 1990. Kaufmann, however, was unaware of the revision at the time of the attempted sale charged in count five. At trial, he sought to introduce the revised form and instructions, but the court rejected them as irrelevant. Kaufmann contends that the form was more comprehensive and clearer, in response to substantial confusion among dealers as to their duties in reporting. Kaufmann argues that it was error to reject this material, apparently on the theory that it may have helped him show excusable misunderstanding with respect to his duties in preparing and filing the form.

Counts one to four charged Kaufmann in part with knowing that the transactions were designed to avoid a transaction reporting requirement under federal law. Those counts under § 1956(a)(1)(B) are not before us. Count five, under § 1956(a)(3)(B), does not charge him with an intent to avoid a transaction reporting requirement. Kaufmann argues only generally that this material would be relevant to count five as well, and fails to suggest any particular change in the form or instructions which would aid him in raising a reasonable doubt about his intent to conceal. Because the revisions were not relevant to count five, exclusion could not have been in error as to that count.

We note that on the form Kaufmann was preparing for the "sale" with Myre, he would have reported Ahern (using the alias Adams) as the "Individual or Organization for Whom this Transaction Was Completed." The revised form used the terms "Identity of Individual From Whom the Cash Was Received." The evidence clearly demonstrates that Kaufmann was willing to report Ahern as the person purchasing and paying for the vehicle. Such willingness tends to prove his intent to conceal the fact that the funds and car belonged to Myre.

## G. SENTENCE ENHANCEMENT/OBSTRUCTION OF JUSTICE

At sentencing, the district court gave Kaufmann a two-point enhancement for obstruction of justice. Section 3C1.1 of the United States Sentencing Guidelines provides:

If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during

the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

The commentary to the Sentencing Guidelines includes the following as examples of conduct to which the enhancement applies:

(a) threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witness, or juror, directly or indirectly, or attempting to do so;

\* \* \* \* \* \*

(f) providing materially false information to a judge or magistrate;

(g) providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense[.]

The term "material," as used in § 3C1.1, means "evidence, fact, statement, or information that, if believed, would tend to influence or affect the issue under determination." Application Note 5 to § 3C1.1.

■ The probation department recommended a two level enhancement for obstruction of justice based on three considerations and the district court agreed. A sentencing court's determination that a defendant obstructed justice is a finding of fact which is reviewed on appeal under a clearly erroneous standard. *United States v. Easley*, 977 F.2d 283, 286 (7th Cir.1992); *United States v. Casanova*, 970 F.2d 371, 377 (7th Cir.1992). On appeal, we defer unless we are left with a definite and firm conviction that a mistake has been committed. *See United States v. Caicedo*, 937 F.2d 1227, 1233 (7th Cir.1991).

■ First, the district court found that Kaufmann threatened Schafer in an effort to intimidate him. Two days after the "sting operation," Kaufmann told Schafer that he was concerned that he might be in some legal trouble. Kaufmann stated, "I don't want to get involved with something and I would take a personal vendetta against somebody that got me involved and I have enough money to cause a guy some hardship." This conversation was audiotaped. The court found that Kaufmann's statement "would have the impact of intimidating to some degree Schafer." Tr. at 1111. Obstruction of justice need only be found by a preponderance of the evidence. The district court's finding that Kaufmann had threatened Schafer was not clearly erroneous.

■ Second, the district court adopted the probation department's recommendation that an enhancement for obstruction of justice was appropriate in light of Kaufmann's testimony regarding untaped discussions he had with Schafer—discussions concerning Myre's real estate dealings and pending divorce. The PSI provided, "Mr. Kaufmann provided a false explanation for his understanding of the facts regarding where the money came from. He falsely alleged Mr. Schafer said things which the tapes revealed he had not said." Concerning this factor and the third factor (discussed below), the court commented:

The other two testimonial aspects of the enhancement for obstruction enhancement of justice are ones that I think exist. I am not sure how important they were to the aspect or to the prosecution of the case but all things considered, the court is going to and does decline to remove the two point enhancement for the obstruction enhancement of justice.

Tr. at 1111–12. The district judge also signed the judgment and marked to indicate, "The court adopts the factual findings and guideline application in the presentence report." An attached statement showed that the court refused one possible enhancement, but did "assess 2 points for 'obstruction of justice' as set forth in the PSI...." Kaufmann contends that the district court effectively delegated its fact finding function to the probation department when it "decline[d] to remove" the two point enhancement.

■ False testimony as to a material fact is subject to an enhancement at sentencing. *United States v. Barnett*, 939 F.2d 405, 408 (7th Cir.1991). Where the record does not clearly demonstrate that the jury *must* have concluded that the defendant told a material lie on the stand, *United States v. Lozoya–Morales*, 931 F.2d 1216, 1220 (7th Cir.1991) (emphasis in origi-

nal), the district court must make a specific, independent finding that the defendant was less than truthful when he testified, and that he had a "conscious purpose" to obstruct justice. *Easley*, 977 F.2d at 286 (citing *United States v. Davis*, 938 F.2d 744, 747 (7th Cir.1991)). *Id.* We do not read the judge's statements as suggesting that he failed to independently consider the appropriateness of the enhancement. Although the district court did not explicitly state his findings on the record at sentencing, we believe his statements then and in the judgment are tantamount to a finding. His decision to rely on the information in the PSI rather than believe Kaufmann's assertions was essentially a judgment of Kaufmann's credibility. "We defer to the [sentencing] court's ... credibility determinations unless they are without support in the record...." *Brown*, 944 F.2d at 1379; *quoted in Beal*, 960 F.2d at 634. The district court had ample support in the record to support its conclusion that Kaufmann made material misstatements while under oath. The court's discretion to apply a two-point enhancement for obstruction of justice on this and the first ground was not clearly erroneous.

However, the district judge did not attach a written record of such findings to the PSI, as required by Federal Rule of Criminal Procedure 32(c)(3)(D). Rule 32(c)(3)(D) requires the court to respond to the matters controverted either by making (1) a finding as to each allegation or (2) a determination that the disputed matter will not be relied on for sentencing. *United States v. Pless*, 982 F.2d 1118, 1128 (7th Cir.1992); *United States v. Coonce*, 961 F.2d 1268, 1277 (7th Cir.1992); *United States v. Jewel*, 947 F.2d 224, 234 (7th Cir.1991). The rule also provides that a written record of the court's findings or determination must be attached to the presentence report and thereafter made available to the Bureau of Prisons. Fed. R.Crim.P. 32(c)(3)(D). This provision serves two purposes: "(1) to ensure that the court deals with and responds to a defendant's PSI objections before sentencing him or her; and (2) to provide prison and parole authorities with a clear record

of how such disputes were resolved[.]" *Pless*, 982 F.2d at 1128 (citing *United States v. Eschweiler*, 782 F.2d 1385, 1387–88 (7th Cir.1986)).

As discussed above, Judge Warren's statements on the record concerning the enhancement for obstruction of justice were sufficiently specific to constitute factual findings under Rule 32(c)(3)(D). However, the second purpose of the rule has not been served. From the record before us, it is not apparent that the court provided an attachment to the PSI detailing the resolution of the disputed matters. Therefore, although resentencing is unnecessary, we remand for the limited purpose of directing that the findings of the court be appended to the PSI for the benefit of the Bureau of Prisons and others who later may need to rely on these findings. *United States v. Villasenor*, 977 F.2d 331, 338–39 (7th Cir.1992); *Pless*, 982 F.2d at 1129.

And finally, Kaufmann challenges the district court's reliance on statements made by Kaufmann during the sting operation. The PSI set out the following facts:

> Throughout his dealing with Agent Myre, it was obvious Agent Myre, not Agent Ahern had carried the money into Kaufmann's office and controlled the money. Agent Myre testified he brought the briefcase of money into the office, placed it next to his chair on the side away from Agent Ahern, picked up the suitcase and opened it in front of Mr. Kaufmann to reveal the money, took the money out of the briefcase and handed it to Mr. Kaufmann for counting. All the discussion regarding money was between him and Mr. Kaufmann.

However, when asked by the "arresting" officers, Kaufmann denied knowing which agent (Myre or Ahern) was handling the money. The district court found that Kaufmann's conduct warranted an enhancement for obstruction of justice.

The commentary to the Sentencing Guidelines specifies a number of examples of conduct that does not warrant application of the enhancement. Application Note 4(b) provides that enhancement is not ap-

propriate where a defendant makes "false statements, not under oath, to law enforcement officers, unless Application Note 3(g) above applies[.]" Under Application Note 3(g), enhancement is appropriate where the defendant makes "a materially false statement that significantly obstructs or impedes the official investigation or prosecution of the instant offense." The government concedes that the statement did not hinder its investigation. Appellee's Brief, at 46; Tr. at 1090. However, because we uphold the enhancement based on the district court's other two findings, we need not remand for re-sentencing.

For the foregoing reasons, the jury's conviction and the district court's sentence are AFFIRMED. We remand only for the limited purpose of the district court's compliance with the attachment provision of Rule 32(c)(3)(D).