UNITED STATES of America,
Plaintiff–Appellee,

v.

Jose **RODRIGUEZ**, Defendant–Appellant.

No. 93–3258.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 23, 1994.

Decided April 27, 1995.

Rehearing Denied June 9, 1995.

Andrew B. Baker, Jr., Asst. U.S. Atty. (argued), Dyer, IN, for plaintiff-appellee.

David L. Chidester (argued), Valparaiso, IN, for defendant-appellant.

Before POSNER, Chief Judge, and COFFEY and KANNE, Circuit Judges.

COFFEY, Circuit Judge.

On February 13, 1992, a grand jury returned a thirty-five count indictment against fifteen individuals, including the defendant, Jose Rodriguez. Counts two and thirty-four were the only counts which specifically named Rodriguez; count two charged him with conspiring to possess with intent to distribute cocaine,[1] in violation of 21 U.S.C. §§ 841(a)(1) and 846, and count thirty-four charged him with money laundering and aiding and abetting money laundering, in viola-

tion of 18 U.S.C. §§ 2 and 1956(a)(1)(B)(i). A jury convicted Rodriguez of both charges, conspiring to possess with intent to distribute cocaine and money laundering.

The court sentenced Rodriguez to two concurrent seventy-month terms of imprisonment, to be followed by two concurrent six-year terms of supervised release. The court also imposed a $12,500 fine and a $100 special assessment. Rodriguez seeks reversal of his convictions, asserting that: (1) the government's evidence was insufficient to support his conviction on either charge; (2) he received ineffective assistance of counsel in violation of his Sixth Amendment rights; and (3) the trial court committed reversible error when it failed to instruct the jury regarding his mid-trial absence. We affirm.

## I. BACKGROUND

Jose Rodriguez was a member of the Rodriguez–Corral drug alliance which distributed cocaine, heroin, and marijuana throughout Northern Indiana and Illinois.[2] Gilberto Rodriguez–Corral ("Gilberto"), the defendant's half brother, and Luis Corral were the leaders of the alliance. Gilberto played a central role in the drug ring; he would purchase one kilogram of cocaine from each shipment, and then divide the one kilogram into smaller amounts for distribution to the other members of the conspiracy. Each time Gilberto purchased cocaine, a different member of the group would become the "holder." The holder would sell the cocaine to other members of the distribution ring who would in turn re-sell it to individual purchasers.

One point of distribution for the cocaine—a front to conceal the ring's drug distribution—was a video store located in Calumet City, Illinois, owned by another member of the conspiracy, Maria Cabello ("Maria"), Gilberto's girlfriend. Gilberto (the defendant's half brother) and Felipe Rodriguez ("Felipe"), the defendant's brother, leased the video store from Helen Rogalski, who testified at trial that Barbara Rodriguez, the defendant's

---

1. The other thirty-three counts did not specifically name Rodriguez; however, count two incorporated by reference the conduct alleged in counts three through thirty-five as "overt acts" committed in furtherance of the conspiracy.

2. Details of the drug ring's operations are contained in *United States v. Cabello,* 16 F.3d 179 (7th Cir.1994) and *United States v. Padilla,* 23 F.3d 1220 (7th Cir.1994).

wife, informed her that Barbara and Maria operated the store and that the defendant and Felipe were responsible for paying the business expenses.[3] Rogalski also testified that Barbara and the defendant paid the store's monthly rent of $700 in cash.

Maria's brother, Ramiro Cabello, frequently visited the video store and received from Maria cocaine which he later sold. Elizabeth Santos, Ramiro's girlfriend, testified that between late 1988 and February 1990, she accompanied Ramiro to the video store at least one-hundred times and that on each occasion, Maria had handed him approximately five ounces of cocaine. Santos also testified that Ramiro did not pay for the drugs when Maria gave them to him, but that Maria would meet with Ramiro later that night to receive payment from the proceeds of the drug sales.[4]

Santos witnessed the defendant participate in one of these cocaine transactions. During one of her visits to the video store with Ramiro, she was in the rear of the store playing a video game while she waited for the delivery of the drugs, when she saw the defendant arrive and give Maria a brown paper lunch bag which Santos testified contained five ounces of cocaine. Santos saw Maria hand the bag containing cocaine to Ramiro, who then left the store. Santos testified that she knew the defendant personally, having seen him several times at a bar Ramiro owned in East Chicago, Indiana, and recognized him when he delivered the drugs to Maria.

Several witnesses also testified at trial concerning the efforts of the conspirators to conceal the source of their illegal drug proceeds. Members of the alliance purchased several properties; in some cases, the actual purchaser of the home would place the title in the name of another member of the conspiracy, and in other cases, one member of the conspiracy would purchase a home, but another member would move in and occupy it.[5] At trial, the government argued that these purchases and occupancy patterns of this nature demonstrate an effort on the part of the alliance to conceal the true ownership of the homes, as well as the illegal source of the funds—drug sale proceeds—used to purchase them.

According to the testimony, the conspirators' efforts to conceal their drug profits began on December 8, 1988, when Maria Cabello, a conspiracy member, purchased a home on Sheffield Avenue in Hammond, Indiana, for $12,000. In spite of the fact that Maria never resided in this home, the title to the house remained in her name, while Luis Corral lived there.

The second suspect home purchase occurred in September 1990, when Gilberto and the defendant purchased a house on Towle Street in Hammond, Indiana for $13,500. Real estate agent Richard Rombotis testified that the defendant's cousin, Victor Arredondo, deposited a $500 check in earnest money, drawn on the account of Jose and Barbara Rodriguez. Arredondo testified that Gilberto had agreed to help him pay for the home, and that in return, he planned to make monthly rent payments to Gilberto. At the closing for the house, Arredondo paid the $13,000 balance with two cashier's checks: one for $7,000, purchased by Rodriguez, and the other for $6,000, purchased by Gilberto. Although Arredondo was listed on the title as the owner of this house, he refused to live there, refused to pay the $500 monthly rent

---

3. Helen Rogalski testified that the defendant and Felipe were responsible for the "business expenses," although she never specified what those business expenses were.

4. This type of transaction, known as "fronting" drugs, is one in which drugs are provided to a seller on credit, with the agreement that the seller will pay for the drugs with the proceeds from his sales.

5. Real estate agent Richard Rombotis testified that Gilberto and the defendant paid for a home on Towle Street, although the title to the residence was in the name of the defendant's cousin, Victor Arredondo. Sales agent Clifford Rapp testified that the defendant purchased a home on Pulaski after he and Luis Corral co-signed a purchase agreement. However, Corral subsequently had his name taken off the purchase agreement, and Gilberto and Maria, other members of the conspiracy, actually occupied the home. Attorney Robert Selund testified that Maria Cabello purchased a home on Sheffield Avenue; however, Luis Corral, another drug ring member, lived there.

Gilberto demanded, and later requested that his name be removed from the title. However, title to the house remained in Arredondo's name.

A third questionable home purchase occurred on February 5, 1991, when the defendant purchased a second house on Pulaski Street in Calumet City, Illinois. Rodriguez and Luis Corral co-signed a purchase agreement, and Rodriguez made a $1,000 cash downpayment to be applied as earnest money toward the purchase of the property. The sales agent, Clifford Rapp, gave Rodriguez a receipt and photocopied the currency.[6] Barbara Rodriguez's name was later substituted for Corral's on the purchase agreement. Although the defendant and his wife paid for the home, Gilberto and his girlfriend Maria resided there.[7]

The Drug Enforcement Agency ("DEA") began investigating the Rodriguez–Corral drug alliance late in 1990, after DEA agents arrested Jesus Adame for possession of sixteen pounds of marijuana. Subsequent to his arrest and while under the direction of the agents, Adame agreed to cooperate with them and participate in controlled drug buys from members of the alliance, including Luis Corral. In addition, DEA agents placed several of the properties owned by drug ring members under surveillance. DEA agent Hargrove testified that during the surveillance of the house on Sheffield Avenue, he discovered remnants of packaging customarily used for drug sales and envelopes inscribed with monetary figures in the garbage placed at the curbside. A DEA agent also had Luis Corral under surveillance as he returned to the house on Sheffield after his participation in a controlled drug transaction with the DEA informant, Adame.

Based on this information and on other evidence in the DEA's possession, DEA agents secured and executed warrants to search the houses located on Sheffield and Pulaski, as well as the defendant's home on 156th Street in Calumet City, Illinois. During the search of the house on Sheffield, the DEA recovered cocaine, marijuana, $223,292 in United States currency, memo and address books,[8] a digital scale, and plastic duct-taped packages customarily used in cocaine sales. Gilberto and Maria were present when the DEA searched the house on Pulaski, where the DEA recovered cocaine, $7,200 in United States currency, and a photograph of Gilberto, Corral, the defendant and his wife, Barbara. While the DEA agents were searching this house, the defendant arrived at the house, told the agents that he owned the property, and asked to speak with his brother. During the search of the defendant's home on 156th Street in Calumet City, DEA agent O'Meara found a DEA notification of seizure form sent to Gilberto pertaining to $7,200 seized from the earlier search of Gilberto's residence on Pulaski in a garbage bag behind the house. The DEA seized the defendant's briefcase,[9] which contained the search warrant executed for the earlier search of the house on Sheffield, photographs of that house, and a receipt for property seized during the DEA's prior search of that house.

---

6. Rapp testified that he always photocopies the instrument or currency used for an earnest money deposit so that he can provide mortgage companies with documentary evidence of earnest money deposits. The DEA later examined the photocopies of Rodriguez's $1,000 cash payment of earnest money and determined that the serial numbers of the two $100 bills and the fourteen $50 bills matched the serial numbers of the bills the DEA used in a controlled drug purchase involving Corral that same day.

7. The defendant and his wife, Barbara, paid $17,000 for this property with two cashier's checks; one drawn for $9,000 and the other for $8,000. Barbara testified that she had the checks drawn for amounts less than $10,000 to avoid the necessity of the required IRS report concerning the origin of the funds. When the

bank teller explained to her that the law required the IRS form even for cashier's checks drawn for less than $10,000, she still requested two separate cashier's checks. The IRS forms reflected that the money belonged to the defendant and his wife.

8. DEA agent Carlson compiled the data from the memo and address books and concluded that the entries in the books referred to cocaine sales which took place between March 1989, and February 1991, and which involved approximately 87.75 kilograms of cocaine and proceeds of $1,401,530.

9. The parties have stipulated that the briefcase found during the search of the home on 156th Street belonged to the defendant.

The trial of Jose Rodriguez, Maria Cabello and Ramiro Cabello commenced on August 25, 1992 with all of the defendants present, but on the fifth day of trial Rodriguez failed to appear. When the court asked Rodriguez's attorney about his client's whereabouts and his attorney was unable to offer any explanation, the court issued a bench warrant for his arrest, and resumed the trial in Rodriguez's absence. Rodriguez's attorney asked the court to direct the prosecution to refrain from mentioning his client's absence for the remainder of the trial and to give the jurors a limiting instruction admonishing them to disregard his client's absence. Counsel for the two remaining co-defendants objected to the requested limiting instruction. The court declined to instruct the jurors regarding Rodriguez's absence, but ordered the prosecutor and defense counsel to avoid referring to Rodriguez's absence during the trial. After the close of testimony but before final arguments, the court held a jury instruction conference, and the judge inquired of the attorneys again if they wanted a limiting instruction directing the jury to disregard Rodriguez's midtrial absence. The attorneys for Maria Cabello and Ramiro Cabello restated their objections to this instruction, but Rodriguez's attorney said nothing. Accordingly, the court did not give the jury any instruction as to Rodriguez's absence from trial.

The jury found Rodriguez guilty of counts two and thirty-four of the indictment, conspiracy to possess with intent to distribute cocaine and money laundering. Sometime thereafter Rodriguez reappeared and surrendered to a United States Marshal and was sentenced on September 14, 1993.

## II. ISSUES

Rodriguez raises three issues on appeal: (1) whether the government presented sufficient evidence to support his convictions for conspiracy to possess with intent to distribute cocaine and money laundering; (2) whether he received ineffective assistance of counsel in violation of his Sixth Amendment rights; and (3) whether the trial court committed reversible error when it failed to give the jury a limiting instruction regarding Rodriguez's midtrial absence.

## III. DISCUSSION

### A. *Sufficiency of the Evidence*

Rodriguez contends the evidence the government presented was insufficient to support his conviction for either conspiracy to possess with intent to distribute cocaine or money laundering. When faced with a challenge to the sufficiency of the evidence, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). Reversal is warranted "only when the record is devoid of any evidence, regardless of how it is weighed, from which a jury could find guilt beyond a reasonable doubt." *United States v. Garcia,* 35 F.3d 1125, 1128 (7th Cir.1994) (citation omitted).

### 1. *The Evidence of the Conspiracy to Possess with Intent to Distribute Cocaine*

■ Rodriguez argues that aside from the testimony of Elizabeth Santos, the government's case against him was based on guilt by association. Rodriguez claims that because of his familial ties to other members of the conspiracy, he was convicted without sufficient evidence linking him to the narcotics distribution ring. The government contends that the evidence linking Rodriguez to the drug distribution ring was overwhelming. After reviewing the evidence, we are convinced that the prosecution presented the jury with more than sufficient evidence to support Rodriguez's conviction for his role in the Rodriguez–Corral drug alliance.

The Seventh Circuit defines a conspiracy as " 'a combination or confederation of two or more persons formed for the purpose of committing, by their joint efforts, a criminal act.' " *United States v. Johnson,* 26 F.3d 669, 684 (7th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 344, 130 L.Ed.2d 300 (1994) (quoting *United States v. Gutierrez,* 978 F.2d

1463, 1469 (7th Cir.1992)). To prove a conspiracy, the government must establish that " '[1] there was an agreement between two or more persons to commit an unlawful act, [2] that the defendant was a party to the agreement, and [3] that an overt act was committed in furtherance of the agreement by one of the co-conspirators.' " *United States v. Navarez,* 954 F.2d 1375, 1380 (7th Cir.1992) (quoting *United States v. Muehlbauer,* 892 F.2d 664, 667 (7th Cir.1990)) and *quoted in United States v. Olson,* 978 F.2d 1472, 1478 (7th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1614, 123 L.Ed.2d 174 (1993).

When a defendant challenges the sufficiency of the evidence connecting him to a conspiracy on appeal, "substantial evidence should be the test rather than slight evidence or slight connection." *Johnson,* 26 F.3d at 684 (quoting *Olson,* 978 F.2d at 1479). Direct evidence of the conspiratorial agreement "need not be shown, an agreement can be inferred from the circumstances." *United States v. Balzano,* 916 F.2d 1273, 1284 (7th Cir.1990) (citations omitted). Due to the covert nature of a conspiracy, direct evidence is rare and

> not only is the use of circumstantial evidence permissible, but circumstantial evidence may be the sole support for a conviction.... Circumstantial evidence is not less probative than direct evidence and, in some cases is even more reliable.... The evidence need not exclude every reasonable hypothesis of innocence so long as the total evidence permits a conclusion of guilt beyond a reasonable doubt.

*Id.* (citations and internal quotations omitted).

In order to convict for conspiring to distribute drugs, "there must be facts in evidence in addition to a sale for resale from which proof of a conspiracy to distribute can be inferred." *United States v. Baker,* 1 F.3d 596, 597 (7th Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 412, 126 L.Ed.2d 359 (1993). "In determining whether a defendant was a

party to the conspiracy at issue, this court has considered the existence of mutual dependence or mutual support among the defendant and members of the conspiracy as evidence suggesting that the defendant did, in fact, join the conspiracy." *United States v. Testa,* 33 F.3d 747, 750 (7th Cir.1994) (citing *United States v. Townsend,* 924 F.2d 1385, 1392 (7th Cir.1991)).

The evidence of Rodriguez's willing and active participation in the conspiracy begins with Elizabeth Santos, who testified that she witnessed Rodriguez deliver a brown bag containing five ounces of cocaine to Maria Cabello at the video store and leave the store without receiving payment. An individual's participation in drug deals which involve credit transactions such as "fronting" is "strong evidence of membership in a conspiracy." *Baker,* 1 F.3d at 597. If Rodriguez were not an integral member of the conspiracy, it is inconceivable that he would have entrusted Maria with the cocaine without receiving immediate payment.[10] Rodriguez's fronting of drugs to Maria was significant evidence of his direct participation in the drug conspiracy.

Santos also testified about the drug ring's operations based on the one-hundred trips she made to the video store with Ramiro to pick up drugs. She explained that a different member of the conspiracy would act as the "holder" of each shipment of cocaine, and divide and distribute it to other members of the group. She also described the numerous transactions she witnessed at the video store, where, on each occasion, Maria would "front" drugs to Ramiro, who would pay Maria later after selling the drugs. Based on the testimony of Elizabeth Santos regarding Rodriguez's role in the drug transaction at the video store and the drug distribution operation as a whole, a rational jury could certainly infer that Rodriguez did not simply deliver drugs to Maria on that single day, but rather that he was an integral part of the larger conspiracy to distribute cocaine. *See United States v. Hill,* 40 F.3d 164, 166–67 (7th Cir.

---

10. " 'Judges in the federal system, whether they are in the trial or appellate system, do not operate in a vacuum, shielded from knowledge of drug operations in the real world.' " *United States v. Tolson,* 988 F.2d 1494, 1504 (7th Cir.

1993) (quoting *United States v. Perry,* 747 F.2d 1165, 1169 (7th Cir.1984)) and *quoted in United States v. Hatchett,* 31 F.3d 1411, 1420 (7th Cir. 1994).

1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1385, 131 L.Ed.2d 238, 1995 U.S. LEXIS 2195 (1995) (quoting *United States v. Beverly,* 913 F.2d 337, 360 (7th Cir.1990), *cert. denied,* 498 U.S. 1052, 111 S.Ct. 766, 112 L.Ed.2d 786 (1991)) ("[w]hen the trier of fact is a jury, we must 'defer to reasonable inferences drawn by the jury and the weight it gave to the evidence' "). Santos's testimony clearly illustrated the mutual dependence or support among the various members of the alliance. *See Testa,* 33 F.3d at 750.

■ Rodriguez contends that Santos's testimony was inherently incredible because her view of the transaction at the video store was obscured, and her observations were, therefore, suspect. However, as a Court of Appeals, "[w]e will not reweigh the evidence or reevaluate the credibility of witnesses." *United States v. Kellum,* 42 F.3d 1087, 1091 (7th Cir.1994). " '[T]he credibility of witnesses is peculiarly within the province of the jury and our review of credibility is prohibited absent extraordinary circumstances.' " *United States v. Rose,* 12 F.3d 1414, 1421 (7th Cir.1994) (quoting *United States v. Noble,* 754 F.2d 1324, 1332 (7th Cir.), *cert. denied,* 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985)). It's rather obvious that had the jury not found Santos's testimony to be credible and a reliable witness, they would not have found the defendant guilty. The jury would not have returned a guilty verdict had the jurors found Santos to be an unreliable witness. Rodriguez has not brought to our attention any "extraordinary circumstances" to justify second-guessing the jury's credibility determinations; accordingly, we refuse to overturn his conviction on this basis.

The record contains substantial evidence, aside from Santos's testimony, reflecting Rodriguez's involvement with other members of the conspiracy. Rodriguez attempted to conceal his participation in two separate residential real estate purchases—funded with drug sale proceeds—by placing the titles of the two homes in the names of other members of the conspiracy. In the first of these transactions, Rodriguez and his half brother Gilberto purchased a home on Towle Avenue with two cashier's checks totalling $13,000, but placed the title in the name of Rodriguez's cousin, Victor Arredondo, who never lived in the house and eventually asked that his name be removed from the title. In the second of these transactions, Rodriguez and Luis Corral co-signed the purchase agreement for a house on Pulaski. Rodriguez gave the realtor a $1,000 cash payment of earnest money for this property. The serial numbers on the sixteen bills that made up the earnest money deposit matched the serial numbers on the bills a DEA informant had used earlier that day to purchase drugs from Luis Corral.[11] At the defendant's request, his wife's name was substituted for Corral's on the purchase agreement for the house on Pulaski. Although Rodriguez and his wife actually owned the home, Gilberto and Maria lived there. These two home purchases were further evidence of the "mutual dependence or mutual support" among the conspirators, including Rodriguez. *See Testa,* 33 F.3d at 750 ("mutual dependence" among conspiracy members may support a finding that a particular defendant joined the conspiracy).

Other evidence, including physical evidence discovered during the searches conducted at the houses owned by various members of the conspiracy, linked Rodriguez to the alliance. During the search of Rodriguez's house on Pulaski, the DEA discovered cocaine, $7,200 in currency, and a photograph of Gilberto, Luis Corral, the defendant and his wife. During the subsequent search of Rodriguez's residence on 156th Street, the DEA found a DEA notification of seizure form sent to Gilberto pertaining to $7,200 seized from the earlier search of Gilberto's residence on Pulaski, as well as the defendant's briefcase, which contained the search warrant for the house on Sheffield, photographs of that house, and a receipt for property seized during the search of that house.

This evidence combined with all the facts and circumstances, when considered as a whole and viewed in the light most favorable to the prosecution, leads us to a single con-

---

11. This earnest money deposit was the basis for the money laundering charge against Rodriguez discussed below.

clusion: a rational jury could readily have found that Rodriguez was not only associated with the other conspirators, but actively participated in the cocaine distribution ring. Because the record is replete with concrete examples of the defendant's efforts as an active participant in the drug sales operation as well as in conjunction with others to further the conspiracy's objectives, we uphold his conviction for conspiring to possess with intent to distribute cocaine.

### 2. The Evidence of Money Laundering

■ Rodriguez also challenges the sufficiency of the evidence to support his conviction under 18 U.S.C. § 1956(a)(1)(B)(i) for money laundering.[12] He contends that the prosecution presented insufficient evidence to demonstrate that he knew that the $1,000 cash payment of earnest money on the Pulaski house came from drug sale proceeds.[13] Rodriguez argues that the evidence established only that Luis Corral, who was involved in a controlled drug sale earlier that day, gave him the $1,000 in United States currency to use for the deposit, and that his conviction for money laundering was thus based solely on guilt by association. We disagree.

■ Section 1956(a)(1)(B)(i) prohibits

conduct[ing] a financial transaction knowing that the property involved in the transaction represents the proceeds of some form of unlawful activity and knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of those proceeds.

*United States v. Koller*, 956 F.2d 1408, 1411 (7th Cir.1992). To support a conviction, the prosecution must demonstrate that the defendant had either actual knowledge of the tainted source of funds, or consciously avoided obtaining actual knowledge, because "[i]t is well settled that wilful blindness or conscious avoidance is the legal equivalent to knowledge." *United States v. Antzoulatos*, 962 F.2d 720, 724 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 331, 121 L.Ed.2d 250 (1992). The trial court properly instructed the jury that it could infer knowledge from a combination of suspicion and indifference to the truth.[14]

■ The government presented the evidence of several witnesses to establish that Rodriguez knew, or at a minimum consciously avoided knowing, that the funds he used for an earnest money deposit on the purchase of a house were proceeds from narcotics sales. Initially, we note that Rodriguez does not dispute that the serial numbers on

**12.** 18 U.S.C. § 1956(a)(1)(B)(i) provides:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity—(B) knowing that the transaction is designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

**13.** The evidence produced at trial established that only $1,000 of the $17,000 purchase price of the Pulaski house was derived from drug sale proceeds. *All* of the funds used in a particular transaction need not be derived from drug sale proceeds to support a conviction for money laundering.

[Section 1956(a)(1)(B)(i)] "allow[s] for convictions where the funds involved in the transac-

tion are derived *only in part* from 'specified unlawful activities.' " ... [C]ommingling legal money with illegal [is] suggestive of a design to hide the source.

*United States v. Jackson*, 983 F.2d 757, 768 (7th Cir.1993) (quoting *United States v. Jackson*, 935 F.2d 832, 840 (7th Cir.1991)).

**14.** The court gave the jury the following instruction on the knowledge requirement:

[W]hen the word knowingly is used in these instructions, it means that a defendant realized what he or she was doing and was aware of the nature of his or her conduct, and did not act through ignorance, mistake, or accident. Knowledge may be proved by the defendant's conduct and by all the facts and circumstances surrounding the case.

You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his or her eyes for fear of what he or she would learn, you may conclude that he or she acted knowingly, as I have used the word.

the sixteen bills he gave to the realtor matched the serial numbers on bills from a DEA controlled drug sale. His argument focuses on the fact that real estate agent Rapp, who sold the Pulaski property, testified that he observed Luis Corral hand the $1,000 earnest money to Rodriguez. Rapp heard the two men converse in Spanish, but could not understand what they were saying.

Although this evidence, by itself, might not support a finding that the defendant actually knew, or consciously avoided knowing, the illegal source of the earnest money, the prosecution presented considerable and compelling evidence which inextricably entwined Rodriguez in a complex web of real estate transactions, obviously designed to conceal the ownership of the various properties purchased and the source of funds used for those purchases. Rodriguez participated in two separate real estate purchases, one with Gilberto and one with Luis Corral. When Rodriguez and Gilberto purchased the house on Towle Street, they used two cashier's checks, one purchased by Rodriguez and the other by Gilberto, but placed the title to the house in Rodriguez's cousin's name. When Rodriguez and Corral purchased the house on Pulaski, they used the $1,000 proceeds from Corral's drug sale to the DEA informant along with Rodriguez's apparently legitimate savings. *See Jackson,* 983 F.2d at 768 ("commingling legal money with illegal [is] suggestive of a design to hide the source"). Although Rodriguez and his wife paid for this home, and his wife's name was substituted for Corral's on the purchase agreement, Gilberto and Maria Cabello made this property their home.[15]

This evidence, combined with the testimony of Elizabeth Santos, who observed Rodriguez participate in one drug delivery, clearly supports a finding that Rodriguez had actual knowledge of the drug ring's operations and actively participated in its real estate transactions. If, in fact, Rodriguez was not aware that the $1,000 in bills he used as earnest money for the purchase of the Pulaski house, his lack of knowledge "amounted at a mini-

mum to wilful blindness or conscious avoidance" of the truth. *Antzoulatos,* 962 F.2d at 724. Accordingly, we refuse to overturn the jury's finding of guilt.

### B. *Adequacy of Rodriguez's Counsel*

■ Rodriguez claims that his trial counsel's performance was ineffective because he failed to adequately cross-examine Elizabeth Santos regarding her ability to observe the drug transaction between Rodriguez, Maria and Ramiro at the video store. To succeed on an ineffective assistance of counsel claim, a defendant must establish that "[his] trial counsel's performance was deficient and that such deficient performance so prejudiced [his] defense as to render the result of [his] trial 'fundamentally unfair or unreliable.'" *Kellum,* 42 F.3d at 1094 (quoting *Lockhart v. Fretwell,* —— U.S. ——, 113 S.Ct. 838, 842–43, 122 L.Ed.2d 180 (1993)). "There is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Id.* (quoting *United States v. Kozinski,* 16 F.3d 795, 813 (7th Cir.1994)).

A review of the cross-examination of Elizabeth Santos most eloquently demonstrates the effectiveness of the defendant's trial counsel. Rodriguez's counsel attempted to discredit Santos's credibility by challenging her recollection, her motivation for testifying, and her ability to recognize Rodriguez when she saw him deliver drugs to Maria at the video store. He specifically questioned her about where she was standing when she observed the delivery, the distance between her position and Rodriguez and Maria, what she was doing when she saw the transaction, and whether she was distracted by anything. As the result of the defendant's counsel's thorough cross-examination, the jury had ample opportunity to note any discrepancies in Santos's recollection of the events.

■ Based on his trial counsel's cross-examination of Elizabeth Santos, we refuse to conclude that the defendant's attorney's performance fell below par. Moreover, even

---

**15.** Rodriguez's wife admitted that she suspected that Gilberto was making money from selling drugs because, even though he was unemployed, he had been giving her money to pay the rent and insurance premiums at the video store.

if we were to question the adequacy of his attorney's cross-examination, Rodriguez has not established that, but for his attorney's mistakes, there is a reasonable probability that the outcome would have been different. *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). We have held that "a defendant has a 'burden of supplying sufficiently precise information,' of the evidence that would have been obtained had his counsel undertaken the desired investigation, and of showing 'whether such information ... would have produced a different result.'" *United States v. Kamel,* 965 F.2d 484, 499 n. 45 (7th Cir.1992) (quoting *United States ex rel. Cross v. DeRobertis,* 811 F.2d 1008, 1016 (7th Cir.1987), *cert. denied,* 498 U.S. 842, 111 S.Ct. 122, 112 L.Ed.2d 91 (1990)). Rodriguez has explained neither what Santos's responses to further cross-examination might have revealed nor how those responses might have affected the result. Accordingly, his ineffective assistance of counsel claim must fail.[16]

### C. *Jury Instructions*

■ Rodriguez's final argument is that the trial court committed reversible error when it failed to instruct the jury regarding his absence from trial.[17] Generally, we review a court's refusal to give a proffered jury instruction to determine if the defendant suffered prejudice. *United States v. Cheek,* 3 F.3d 1057, 1060 (7th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1055, 127 L.Ed.2d 376 (1994). It is interesting to note that Rodriguez's counsel failed to provide the court with a proposed instruction on his client's absence much less authority to support such an instruction. On the first day

that Rodriguez failed to appear for trial, his attorney requested the court to give the jury a limiting instruction admonishing them to disregard his absence. The court directed the prosecution to refrain from mentioning Rodriguez's absence during the trial. When the court questioned Rodriguez's attorney further about a limiting jury instruction, he expressed doubt as to whether such an instruction would be beneficial, or detrimental, to his client's defense:

> Judge, I'm in a situation here where an absence of an instruction or giving an instruction is probably harmful either way to [my client]. I suppose that ... I would rather have the Court give an instruction that no prejudices—or no evidence of guilt—no inferences are to be drawn from the absence of [Rodriguez] at this point....

Although Rodriguez's counsel did not proffer a proposed instruction, the court proposed the following language:

> One of the Defendants who started this trial is no longer present. You are not to speculate as to the reason why he is no longer present. The absence of Defendant Rodriguez should not be considered by you against any other Defendant. His absence should not influence your verdict in any way whatsoever with respect to the remaining Defendants who are present.

The remaining defendants objected to this instruction, and the court decided not to give the jury this instruction mid-trial, but offered to reconsider the limiting instruction at the formal jury instruction conference.

Rodriguez's counsel was given a second opportunity to argue for, or against, the lim-

---

**16.** We recently commented on the frequency with which criminal defendants "demonize" their lawyers:

Claims of ineffective assistance [of counsel] have become routine. If we are to believe the briefs filed by appellate lawyers, the only reason defendants are convicted is the bumbling of their predecessors. But lawyers are not miracle workers. Most convictions follow ineluctably from the defendants' illegal deeds, and nothing the lawyers do or omit has striking effect.

*Burris v. Farley,* 51 F.3d 655, 662 (7th Cir.1995).

**17.** In *United States v. Barrientos,* 758 F.2d 1152, 1156 (7th Cir.1985), *cert. denied,* 474 U.S. 1062, 106 S.Ct. 810, 88 L.Ed.2d 785 (1986), we noted that "when a co-defendant becomes absent mid-trial for any reason, the best practice is to acknowledge his absence to the jury and to instruct them that it should have no effect on their deliberations regarding the remaining defendants."

iting instruction dealing with his client's midtrial absence at the jury instruction conference. The trial judge stated: "I said I would revisit an instruction about one of the Defendants not being present any longer. Does anyone want to revisit that or you still do not want that? I don't even think they realized he's not here." The attorneys for the other two defendants responded that they did not want a limiting instruction given. Despite the court's invitation to discuss an instruction on Rodriguez's absence, his attorney refused to accept the invitation and remained silent. Accordingly, the court decided to not give any instruction regarding Rodriguez's absence.

On appeal, a defendant may not challenge the trial court's refusal to give a specific jury instruction, unless the defendant "timely objected and 'stat[ed] distinctly the matter to which that [defendant] object[ed] and the grounds of the objection.'" *United States v. Starnes,* 14 F.3d 1207, 1213 (7th Cir.), *cert. denied,* — U.S. ——, 114 S.Ct. 2717, 129 L.Ed.2d 842 (1994) (quoting Fed.R.Crim.P. 30); *Cheek,* 3 F.3d at 1060–61 ("[i]n order to preserve for appeal an objection to a district court's refusal of a proposed jury instruction, a defendant must object, on the record, to the judge's refusal to tender the defendant's instructions, and must clearly state the reasons for his or her objections") (quotations omitted). The requirement of a distinct and specific objection serves "to draw the attention of the trial court to the alleged error at a time when the court is able to rectify the error." *United States v. Kuecker,* 740 F.2d 496, 503 (7th Cir.1984) (quoting *United States v. Jackson,* 569 F.2d 1003, 1009 (7th Cir.), *cert. denied,* 437 U.S. 907, 98 S.Ct. 3096, 57 L.Ed.2d 1137 (1978)).

 Where, as in this case, a defendant failed to specifically request a particular instruction, we review the court's failure to give such an instruction for plain error. *Cheek,* 3 F.3d at 1060; *United States v. Cooper,* 942 F.2d 1200, 1205 (7th Cir.1991), *cert. denied,* 503 U.S. 923, 112 S.Ct. 1303, 117 L.Ed.2d 524 (1992). Under the plain error

standard, we will reverse only if the error was "so egregious that it resulted in an actual miscarriage of justice, which implies the conviction of one who but for the error probably would have been acquitted." *Starnes,* 14 F.3d at 1213 (quotations omitted).

 Based on our review of the record, we hold that the trial court's refusal to give a limiting instruction regarding Rodriguez's absence was not plain error. In *Barrientos,* 758 F.2d at 1156, we noted that a trial judge should acknowledge a co-defendant's midtrial absence to the jury and instruct the jurors "that it should have no effect on their deliberations regarding the remaining defendants." *Id.* This cautionary instruction serves to protect the remaining co-defendants from any prejudice which might result if the jurors were to speculate as to the reason for a co-defendant's absence: "It only adds grist to the mills of speculation for the jurors to know that one defendant has admitted to guilt or that another has been found not guilty." *Id.* at 1156–57. The instruction is not intended to protect the defendant who leaves midtrial.

In this case, Rodriguez's remaining co-defendants objected to a limiting instruction regarding his midtrial absence. Because the primary purpose of this kind of limiting instruction is to protect the remaining co-defendants, the court did not err when it heeded their request. Rodriguez now argues that the court's refusal to give a limiting instruction was plain error, but cites to no case law to support his argument. Neither the court nor the prosecution commented on Rodriguez's midtrial absence, and, indeed, the trial judge observed that he did not believe the jurors even noticed that Rodriguez was gone. Because no one's attention was drawn to the fact that Rodriguez was absent, we are convinced that the court's failure to instruct the jury to disregard his absence was not plain error.

 Moreover, the jury was presented with overwhelming evidence of Rodriguez's guilt, such that the court's failure to give an

instruction on his absence could not possibly have resulted in a miscarriage of justice. Given the sheer volume of evidence presented on Rodriguez's guilt, *see supra* Section III.A., it is ludicrous to suggest that he would have been acquitted had the jury heard an instruction to disregard his absence. The court properly instructed the jury on the presumption of innocence which attends to each defendant, as well as on each juror's duty to consider each defendant's culpability separately based upon the evidence presented.[18] We thus hold that the trial court properly instructed the jury and that the court committed no error, plain or otherwise, when it declined to instruct the jury concerning Rodriguez's midtrial absence.

 One further point deserves brief mention. The government argues that the trial court's failure to give a limiting instruction concerning Rodriguez's absence was, if anything, a benefit to him because, if the court were to have given such an instruction, the government would have requested a flight instruction authorizing the jury to draw an inference of guilt from Rodriguez's absence. Although the government certainly could have requested a flight instruction, this court has discouraged reliance on flight as evidence of guilt because of its often minimal probative value. "We have long adhered to the Supreme Court's counsel that courts be wary of the probative value of flight evidence." *United States v. Williams*, 33 F.3d 876, 879 (7th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1383, 131 L.Ed.2d 236 (1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 483 n. 10, 83 S.Ct. 407, 415 n. 10, 9 L.Ed.2d 441 (1963)). In *Williams*, we noted the difficult and attenuated chain of inferences required for a jury to find a defendant guilty based in part on flight evidence:

The probative value of flight as evidence of a defendant's guilt depends on the degree of confidence with which four inferences can be drawn: (1) from behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

*Id.* (quoting *United States v. Levine*, 5 F.3d 1100, 1107 (7th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1224, 127 L.Ed.2d 569 (1994)). "Because the probative value of flight evidence is often slight, there is a danger that a flight instruction will isolate and give undue weight to such evidence. Consequently, we have discouraged its use in this circuit." *Id.* In this case, the government did not request a flight instruction, and the question of whether the trial court should have given such an instruction is not before this court. Nonetheless, we recognize the need to reassert our position that flight instructions should be given with caution, if at all.

## IV. CONCLUSION

The judgment of the district court is AF-FIRMED.

---

**18.** The court's jury instruction number ten provided that "[t]he defendants are presumed to be innocent of the charges. This presumption remains with the defendants throughout every stage of the trial and during your deliberations on the verdicts, and is not overcome unless from all the evidence in the case you are convinced beyond a reasonable doubt that each of the defendants is guilty." Instruction number sixteen provided that "[a]lthough the defendants are being tried jointly, you must give separate consideration to each defendant. In doing so you must analyze what the evidence in the case shows with respect to each defendant, leaving out of consideration any evidence admitted solely against any other defendant. Each defendant is entitled to have his or her case decided on the evidence and the law applicable to him or her."